[Civ. No. 12343. Fourth Dist., Div. Two. Jan. 4, 1973.]

SUN COMPANY OF SAN BERNARDINO, CALIFORNIA,
Petitioner, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,
Respondent;
THE PEOPLE et al., Real Parties in Interest.

[Civ. No. 12340. Fourth Dist., Div. Two. Jan. 4, 1973.]

PROGRESS-BULLETIN PUBLISHING COMPANY, Petitioner, v.
THE SUPERIOR COURT OF SAN BERNARDINO COUNTY,
Respondent;
THE PEOPLE et al., Real Parties in Interest.

(Consolidated Cases.)

**COUNSEL**

Surr & Hellyer, Robert J. Bierschbach, John D. McAlearney, Jr., Covington & Crowe, George W. Porter, Robert F. Schauer, Carl B. Hilliard and Edward A. Hopson for Petitioners.

A. L. Wirin, Fred Okrand and Laurence R. Sperber as Amici Curiae on behalf of Petitioners.

Stanford D. Herlick, County Counsel, and Roger N. Kehew, Jr., Chief Deputy County Counsel, for Respondent.

Lowell E. Lathrop, District Attorney, and Joseph D. Canty, Jr., Deputy District Attorney, for Real Parties in Interest.

## OPINION

**KERRIGAN, J.**—The Sun Company of San Bernardino (petitioner) is the publisher of The Sun, The Evening Telegram and The Sunday Sun-Telegram, newspapers of general circulation in San Bernardino County. The Progress-Bulletin Publishing Company (petitioner) is the publisher of The Ontario Daily Report and the Pomona Progress Bulletin, newspapers of general circulation in San Bernardino and Los Angeles Counties. Both publishers seek annulment of an order re publicity made by the San Bernardino Superior Court (respondent) prohibiting the news media from printing the names and photographs of several witnesses called by the People (real party in interest) in a murder trial.

The main attack on the order is that it violates freedom of the press.

On April 21, 1972, Frederick Castillo was stabbed to death while confined in the state prison known as the California Institution for Men at Chino. On May 26, 1972, an indictment was returned and filed by the grand jury charging Fred Steve Mendrin and Donald Ray Hale (real parties in interest) with his murder (Pen. Code, § 187). The defendants entered pleas of not guilty. The matter was set for a jury trial.

Trial commenced on Tuesday, October 24, 1972.

On Thursday, October 26, the deputy district attorney in charge of the prosecution requested that the trial court issue an order prohibiting the news media from publishing the true names or photographs of any state prison inmates scheduled to be called as prosecution witnesses in the trial. In support of his motion for an order re publicity (sometimes called "gag orders"), the prosecutor argued that the order was necessary to insure the safety of the nine inmates he intended to produce and in the interests of justice, to wit, of assuring the People a fair trial. The motion was denied without prejudice. In denying the motion, the court commented that there had already been a disclosure of the inmates' identities in the course of

pretrial discovery; that the defendants had known their names for some time; that under the circumstances, publication of the witnesses' names or photos would not increase the danger to the inmates or preclude a fair trial.

On the following Monday, October 30, the prosecutor renewed his motion, and counsel discussed the matter off the record.[1] Following this conference, the court "invited" several members of the local press to attend court that afternoon to inquire further into the matter.

In any event, a reporter from the San Bernardino Sun-Telegram, a reporter for the Pomona Progress-Bulletin, and the editor of the Ontario Daily Report appeared at the afternoon session. The court briefly explained the purpose of the proceeding: a motion had been made for an order prohibiting the news media from printing the names and photographs of several inmates whom the prosecution intended to call as witnesses in a pending murder trial; the publication of the inmates' identities could pose a serious threat to their lives and well-being if they testified for the prosecution; and that the publication of their identities could result in the deprivation of a fair trial for the People inasmuch as the prospective witnesses might refuse to testify if their identities were to be revealed in print.

The following day, the matter was again discussed on the record and an attorney was present upon behalf of petitioner, Progress-Bulletin Publishing Company.

During the course of the foregoing formal and informal hearings on the motion for a limited "gag order," the prosecutor apparently made the following representations to the court: The motion was based on the inmates' right to life and the right of the People to a fair trial; his case was based primarily on the testimony of inmate-eyewitnesses to the stabbing; there was very little corroborative evidence; he feared that if the names of the inmates were published by the local press, they would refuse to testify inasmuch as they had no real incentive to come forward with their testimony; if they did decline to testify, any judicial sanctions that could be imposed (such as contempt) would be merely "token" punishment in view of the time still to be served by the inmates on their main sentences; although none of the inmate-witnesses had told him that they would refuse to testify if their identities were published, he was nevertheless fearful that

---

[1]The record is silent as to what transpired in this discussion. However, the parties concede, and we assume, that the prosecution made an offer to prove that the witnesses had expressed the desire that their names and photos not be published in local papers out of fear that they would be subjected to retribution from other prisoners because of their cooperation with the authorities.

they might refuse because of the potential danger to their lives if their names should appear in print; while the inmates might be willing to testify, his primary concern was that fear might cause them to refuse to testify, thereby resulting in the denial of a fair trial to the People.

James A. Coffman, a correctional counselor of the Department of Corrections, made the following representations to the court in connection with the hearing on the motion:[2] He had been employed within the prison system for 11 years; the Castillo stabbing occurred in the Palm Hall Housing Unit of the Chino prison facility; at that time, he was the supervising correctional counselor at Palm Hall; housed in Palm Hall were "protective custody" inmates, including the nine prospective witnesses to be called by the prosecution;[3] all nine were under his supervision; in his opinion, witnesses who are inmates within the prison system are reluctant to testify; inmates who do testify require special protective-custody treatment; certain inmate groups and organizations (gangs) formulate plans or systems of attacking and killing prosecution witnesses; contraband weapons, usually prison-made, are regularly found in the possession of known members of such gangs; information concerning the identity of inmates who testify, or furnish information to prison officials, is commonly transmitted to other inmates through hearsay statements among the inmates, (the "grapevine"); thereafter, follow harassment and threats against the cooperative inmates and ultimately attempts at violence; but an inmate who has testified for the prosecution can deal with the situation on the basis that the "grape-

---

[2]While some of Officer Coffman's statements were made in open court, many were submitted *in camera*. Again, no attack is made on the nature of the prosecution's offer inasmuch as all parties desire an adjudication on the merits.

[3]*Protective custody inmates* are prisoners who are segregated for their own safety and may be generally classified as follows: (1) informants, (2) those who testify for the prosecution in criminal cases, (3) those who require protection because of involvement in homosexual activities, and (4) those who accrue unpaid gambling debts and who might be victimized for their failure to pay.

However, at the time of the Castillo killing, Palm Hall was also occupied by *violent prisoners* who, because of their dangerous tendencies, required segregation from the general prison population. These violent prisoners represented a serious threat to the remaining prison population.

In early 1972, the prison authorities evidently adopted an "experimental program" in an endeavor to rehabilitate the prisoners segregated in Palm Hall; they decided to "mix" the protective custody inmates and the violent prisoners in the hope that they could restore self-confidence in the protective custody of inmates through supervision and a program of gradually restoring contact with violent prisoners. Thus, the protective custody inmates and those who were violence-prone were mixed as a rehabilitative measure so that both groups could experience some contact with the other, primarily in the recreation area and dining hall at Palm Hall.

Castillo, the homicide victim, was being held in protective custody. The defendants Mendrin and Hale were members of the violent group. Needless to say, after the Castillo killing, the practice of "mixing" the two types of prisoners was discontinued.

vine" information constitutes false hearsay; he can frequently gather about him a group of associates to protect him during periods of exposure to gangland retribution; nevertheless, prison inmates throughout California subscribe to local newspapers, including the Ontario, Pomona and San Bernardino papers; when information concerning an inmate who testified for the prosecution is printed in the newspapers, this information is passed on to other inmates at almost every facility in the state; these newspaper articles serve as "proof" of the hearsay information which may flow through the prison "grapevine" and deprive the inmate who was the witness of the ability to defend himself against the accusation that he cooperated with the authorities; the newspaper account places him in a position of jeopardy and precludes him from recruiting a group of friendly inmates to defend him; he no longer can claim that the "rumors" are erroneous; as a result of his name being printed in the paper, the danger to his life is substantially increased; an inmate who is a witness to a crime has no incentive to testify; a contempt citation does not impress him since he is already incarcerated; any desire to cooperate with the authorities is outweighed by the immediate threat to his life; several of the nine inmates who agreed to testify in the Castillo killing were reluctant to do so; during the preceding year, 24 deaths occurred in the California prison system as a result of inmate assaults; in his opinion, many of the witnesses who would be called by the prosecution in connection with the Castillo stabbing would be reluctant to testify or refuse to testify if told their names would appear in the paper; protection which can be provided a protective custody inmate is limited; complete isolation amounts to inhumane treatment; only two alternatives exist short of isolation: the prisoner can be placed in segregation where he is housed with other similar type inmates; or he can be placed in an institution outside of California; neither of these alternatives is satisfactory.

During the final stages of the hearings on the motion, the three press representatives were requested by the court to agree voluntarily *not* to publish the witnesses' names or photos. All declined to make a pre-publication commitment.

The foregoing factual statement is taken from the unsworn oral representations made by the district attorney and the correctional officer.

At the conclusion of the hearings on the motion, the court made the following order re publicity:

"It is the order of this Court that no true name or photograph of (any) witness who is called by the prosecution to the stand and who was on April 21, 1972 [the date of the Castillo killing], incarcerated in the State

Prison Facility within the California Department of Corrections, and are [*sic*] now, so incarcerated, shall be published in print and disseminated to the public by any form of news media, including but not limited to newspaper and magazine coverage.

"This order does not close the court proceedings to any person or representative of the media nor in any way prevent full reporting of testimony of any witness with the exception of the names and photographs of the witnesses mentioned.

"⋅  .  .  .  .  .  .  o  .  .  .  .  .  .  .  .  .  .  .

"This order shall be in force until this matter has been disposed of and for a period of six (6) months thereafter or until further order of the court."

Before we consider the constitutional integrity of the publicity order involved in this extraordinary review, certain preliminary observations should be made: First, the constitutional issues presented are not moot for several reasons: First, the order was to be in force for a period of six (6) months and is therefore still in effect, notwithstanding the fact that the homicide action has been concluded.[4] Second, the rendition of this and similar orders presents a question of fundamental rights: the right of the parties in a criminal action to a fair trial and the right of a free press— matters of considerable public importance. Finally, while the evidentiary record on review is not as complete as might be desired—no witnesses were sworn or affidavits filed in the court below in connection with the hearing on the motion, nor was any right of cross-examination afforded the newspapers herein—the parties are in agreement as to the form of the proof submitted, although not as to its sufficiency or weight. In other words, the parties desire a resolution of the order's validity and, in our judgment, are entitled to such a determination.

The First Amendment to the United States Constitution states in bold, clear, and unequivocal language that "Congress shall make no law . . . abridging the freedom of speech, or of the press; . . ." Similarly, article I, section 9 of the California Constitution provides that "no law shall be passed to restrain or abridge the liberty of speech or of the press." Both freedom of speech and freedom of press are *fundamental* rights protected by the "due process" clause of the Fourteenth Amendment from impairment by the state (*New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 277 [11 L.Ed.2d 686, 704, 84 S.Ct. 710, 95 A.L.R.2d 1412]), and have

---

[4]Although outside the record on review, the parties agree that: the nine (9) inmates testified for the prosecution; the petitioning publishers complied with the order re publicity; and Hale and Mendrin were both found guilty by jury.

been described as the "matrix, the indispensable condition[s], of nearly every other form of freedom." (*Palko* v. *Connecticut* (1937) 302 U.S. 319, 327 [82 L.Ed. 288, 293, 58 S.Ct. 149].)

On the other hand, a person accused of crime enjoys the fundamental right of a fair trial under the Sixth and Fourteenth Amendments. But strangely, the right of the People to a fair trial, as a correlative to that enjoyed by the accused, does not appear to be stated in constitutional terms. Nevertheless, it seems implicit in any concept of due process that society is entitled to a fair trial for redress of wrongs against it and that the victim of a criminal wrong is certainly entitled to the same right.

In attempting to balance these fundamental rights, some consideration should be given to the background that fostered the fair trial and free press problem.

Following President Kennedy's assassination in November 1963, the Warren Commission, deeply concerned about the actions of the Dallas police in issuing publicity regarding the case, suggested the bar, police and media "work together to establish ethical standards concerning the collection and presentation of information to the public so that there will be no interference with pending criminal investigations, court proceedings, or the right of individuals to a fair trial."[5] Various committees then formed to study the problems of a free press-fair trial.

While the studies were in progress, the United States Supreme Court found the impact of television cameras and lights in a courtroom setting prejudicial to the conduct of a fair trial. (*Estes* v. *Texas* (1965) 381 U.S. 532 [14 L.Ed.2d 543, 85 S.Ct. 1628].) Shortly thereafter, in *Sheppard* v. *Maxwell* (1966) 384 U.S. 333, 358 [16 L.Ed.2d 600, 618, 86 S.Ct. 1507], the defendant's conviction of his wife's murder was reversed because of "[t]he carnival atmosphere at trial" and pervasive publicity affecting the fairness of the hearing. In reversing Dr. Sheppard's conviction, the court stated that: (1) the publicity surrounding a trial may become so extensive and prejudicial in nature that unless neutralized by appropriate judicial procedures, a resultant conviction may not stand; (2) the trial court has the duty of so insulating the trial from publicity as to insure its fairness; (3) a free press plays a vital role in the effective and fair administration of justice. But the court did *not* set down any fixed rules to guide trial courts, law enforcement officers or media as to what could or could not be printed. Instead, the majority suggested that judicial restrictions on *speech* might sometimes be appropriate in the following *dicta*: "The courts

---

[5]Report of the President's Commission on the Assassination of President John F. Kennedy (1964) page 27, footnote 17.

must take such steps by rule and regulation that will protect their processes from prejudicial outside interferences. Neither prosecutors, counsel for defense, the accused, witnesses, court staff nor enforcement officers coming under the jurisdiction of the court should be permitted to frustrate its function. Collaboration between counsel and the press as to information affecting the fairness of a criminal trial is not only subject to regulation, but is highly censurable and worthy of disciplinary measures." (*Ibid.,* p. 363 [16 L.Ed.2d p. 620].)

Acting on the suggestion of the *Sheppard* court to the effect that in an appropriate case, the trial court may issue an order prohibiting lawyers, parties, police officers, witnesses and court officials from giving information *to* the press (*ibid.,* p. 358 [16 L.Ed.2d pp. 617-618]), the Judicial Conference of the United States approved a report of its committee (Kaufman Committee)[6] recommending both the control of information from participants in sensational trials—lawyers, bailiffs, clerks, district attorneys, defense counsel and court personnel—and a firm regulation of the courtroom "environs" to avoid the "carnival" atmosphere deplored in *Sheppard.* The American Bar Association likewise, through its House of Delegates, approved the report of its committee (Reardon Committee)[7] recommending the issuance of orders prohibiting attorneys, court personnel and law enforcement agents from furnishing information *to* the press relative to a pending criminal trial.

While the Kaufman and Reardon Committees recommended some restraints on the release of pretrial publicity in criminal cases, neither they nor the New York City Bar (Medina Committee)[8] suggested any restraint on publication by the press. In fact, the Reardon Committee stated that it did not recommend expanded use of the contempt power against the news media or the enactment of statutory restrictions against the media. (*Id.,* p. 69.) The Medina Committee used even stronger language to the effect that if the court ". . . makes an oral or written order not to publish, this Committee is of the opinion that the First Amendment as interpreted by the Supreme Court bars punishment of the newsman or editor for disobedience of the order. And we think that is as it should be." (*Id.,* p. 45.)

---

[6]Committee on the Operation of the Jury System, Report of the Committee on the "Free Press-Fair Trial" Issue of the Judicial Conference of the United States (1969) 45 F.R.D. 391; (1971) 51 F.R.D. 135.

[7]American Bar Association Project on Minimum Standards for Criminal Justice, Standards Relating to Fair Trial and Free Press (Tentative Draft, 1966). See Reardon, *The Fair Trial-Free Press Standards* (1968) 54 A.B.A.J. 343.

[8]Freedom of the Press and Fair Trial: Final Report with Recommendations by the Special Committee on Radio, Television and the Administration of Justice of the Association of the Bar of the City of New York. (Columbia University Press, 1967.)

Recently, in granting the defendant a change of venue, the California Supreme Court commended the trial court for issuing an order re publicity modeled upon the Reardon Report. (*Frazier* v. *Superior Court* (1971) 5 Cal.3d 287, 295 [95 Cal.Rptr. 798, 486 P.2d 694].) Even more recently, the United States Supreme Court stated that newsmen "may be prohibited from attending or publishing information about trials if such restrictions are necessary to assure a defendant a fair trial before an impartial tribunal." (*Branzburg* v. *Hayes* (1972) 408 U.S. 665, 685 [33 L.Ed.2d 626, 641, 92 S.Ct. 2646, 2658].)[9]

Reflecting the concern of the highest tribunals with the effects of pre-trial publicity, California trial courts have issued a proliferation of gag orders in pending criminal actions (see Warren and Abell, *Free Press-Fair Trial: The "Gag Order," A California Aberration,* 45 So.Cal.L.Rev. 51, 62). This is best illustrated by the case of *People* v. *Sirhan,* Senator Robert F. Kennedy's assassin. After public statements by the Mayor of Los Angeles respecting some incriminating notebook entries reportedly made by the accused, a trial judge ordered all parties to the action, defense counsel and prosecutors, any other attorney, any judicial officer or employee, any public official, the chief of police, the sheriff, any agent, deputy or employee of such persons, any grand juror, any witness before the grand jury, and all prospective trial witnesses to refrain from releasing to the media any purported extra-judicial statements made by the defendant; any evidence the admissibility of which had not yet been ruled upon; any opinion as to guilt or innocence; the nature, substance or effect of any testimony; the identity of any witness; or the nature, source and effect of any purported evidence alleged to have been accumulated. The Los Angeles County District Attorney sought a writ prohibiting enforcement of the order. The petition was denied summarily by both the Court of Appeal and the California Supreme Court. Certiorari was also denied by the United States Supreme Court. (*Younger* v. *Superior Court* (1968) 393 U.S. 1001 [21 L.Ed.2d 465, 89 S.Ct. 489]; 45 So.Cal.L.Rev. 51, 61-62.)

While the dictum in *Sheppard* has been utilized as a broad sanction for trial courts to prohibit court personnel, attorneys, and law enforcement agents from disseminating information to the press during the pretrial proceedings (see *Hamilton* v. *Municipal Court* (1969) 270 Cal.App.2d 797

---

[9]However, the case involved solely the interrogation of newsmen respecting their source of information and did not concern judicial orders restricting speech. The court was careful to point out that "[T]hese cases involve no intrusions upon speech or assembly, no prior restraint or restriction on what the press may publish, and no express or implied command that the press publish what it prefers to withhold." (408 U.S. at p. 681 [33 L.Ed.2d at p. 639, 92 S.Ct. at p. 2656].)

[76 Cal.Rptr. 168, 33 A.L.R.3d 1029], cert. den. 396 U.S. 985 [24 L.Ed.2d 449, 90 S.Ct. 479]),[10] where contempt sanctions have been sought to be imposed directly upon the *press,* or upon one *not immediately subject to judicial supervision,* the high courts have severely limited the judicial power to punish by annulling contempt convictions. (See *Bridges* v. *California* (1941) 314 U.S. 252 [86 L.Ed. 192, 62 S.Ct. 190, 159 A.L.R. 1346] (labor leader's contempt conviction arising out of a letter to the Secretary of Labor describing a California court order as "outrageous"; and newspaper publisher's contempt conviction for publishing an article referring to the defendant-labor leaders as "gorillas" and recommending against granting them probation); *Pennekamp* v. *Florida* (1946) 328 U.S. 331 [90 L.Ed. 1295, 66 S.Ct. 1029] (contempt conviction of an associate editor for articles criticizing the handling of various criminal matters and suggesting the local judges were impeding the administration of criminal justice by the use of technicalities and delays); *Craig* v. *Harney* (1947) 331 U.S. 367 [91 L.Ed. 1546, 67 S.Ct. 1249] (contempt conviction of a publisher and reporter based upon newspaper articles characterizing a judge's directed verdict in a landlord-tenant controversy as "travesty on justice").)

In setting aside the contempt convictions, the United States Supreme Court explicitly rejected the English practice of rigorous judicial control of public information regarding the administration of criminal justice. (See *Bridges* v. *California, supra,* 314 U.S. 252, 263-265 [86 L.Ed. 192, 203-204].)

With the foregoing fundamental rights clearly in mind and with the background of the fair trial-free press controversy in perspective, the issue naturally arises as to when a trial court may impose a prior restraint on publication in connection with a pending criminal trial.

A prior restraint on speech imposed by the legislative or executive branches of government is censorship and is subject to close judicial scrutiny. (See *Joseph Burstyn, Inc.* v. *Wilson* (1952) 343 U.S. 495 [96 L.Ed. 1098, 72 S.Ct. 777]; *Dillon* v. *Municipal Court* (1971) 4 Cal.3d 860 [94 Cal.Rptr. 777, 484 P.2d 945].) Courts are also agencies of govern-

---

[10]In *Hamilton, supra,* the court held valid a pretrial order re publicity which prohibited the "parties" to a criminal action from making any public statements or releases concerning the merits of the case and evidence to be introduced; the order not only applied to the "parties" but to their counsel, all law enforcement agencies, Regents of the University of California, faculty members and members of the Associated Students of the University of California. (In the underlying criminal action, defendants were charged with unlawful occupation of real property and creating disturbances on the Berkeley campus arising out of an incident involving the presence of Armed Forces recruiters on campus.)

ment whose acts are measured by the same constitutional standards. (See *Shelley* v. *Kraemer* (1948) 334 U.S. 1 [92 L.Ed. 1161, 68 S.Ct. 836, 3 A.L.R.2d 441]; *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254.) Thus, when a court issues an order in a pending criminal action restraining publication of news respecting the proceeding, its order constitutes censorship which carries a heavy presumption against its constitutional validity. (*Organization for a Better Austin* v. *Keefe* (1971) 402 U.S. 415, 419 [29 L.Ed.2d 1, 5, 91 S.Ct. 1575].)

Before a court can restrict freedom of speech or press, the prohibited speech or published material must constitute a "clear-and-present danger" to the administration of justice. This requires that the substantive evil or danger must be extremely serious and the degree of imminence extremely high. (*Bridges* v. *California, supra,* 314 U.S. 252, 263.) First Amendment rights may not be sacrificed merely because some evil may result. (*United States* v. *Auto. Workers* (1957) 352 U.S. 567, 596 [1 L.Ed.2d 563, 581, 77 S.Ct. 529] (dissenting opinion).) There must be no doubt that the utterances in question are a serious and imminent threat to the administration of justice; the danger must not be remote or even probable; it must immediately imperil. (*Craig* v. *Harney, supra,* 331 U.S. 367, 376 [91 L.Ed. 1546, 1552].) "Whether the threat to the impartial and orderly administration of justice must be a clear and present or a grave and immediate danger, a real and substantial threat, one which is close and direct or one which disturbs the court's sense of fairness depends upon a choice of words. Under any one of the phrases, reviewing courts . . . [must] appraise the comment on a balance between the desirability of free discussion and the necessity for fair adjudication, free from interruption of its processes." (*Pennekamp* v. *Florida, supra,* 328 U.S. 331, 336 [90 L.Ed. 1295, 1298].)

The clear-and-present danger test[11] has been severely criticized both as giving too much protection to speech (see J. Frankfurter's dissenting opinions in *Bridges* v. *California, supra,* 314 U.S. at p. 279 [86 L.Ed. at p. 212] and *Craig* v. *Harney, supra,* 331 U.S. at p. 384 [91 L.Ed. at p. 1556]; and his concurring opinion in *Dennis* v. *United States* (1951) 341 U.S. 494, 539 [95 L.Ed. 1137, 1168, 71 S.Ct. 857]), and as giving too little. (See Meiklejohn, Free Speech and Its Relation to Self-Government, reviewed by Professor Chafee (1949) 62 Harv.L.Rev. 891.) Another

---

[11]In addition to the "clear and present danger" test in free speech-free press cases, a new concept has been developed in situations involving the violation of a gag order: whether the prohibited speech creates a "reasonable likelihood" of interference with a pending criminal trial. (See *United States* v. *Tijerina* (10th Cir. 1969) 412 F.2d 661, 666 [5 A.L.R. Fed. 935], cert. den. 396 U.S. 990 [24 L.Ed.2d 452, 90 S.Ct. 478].)

legal scholar faulted the test in these words: " 'The truth is that the clear-and-present danger test is an oversimplified judgment unless it takes account also of a number of other factors: the relative seriousness of the danger in comparison with the value of the occasion for speech or political activity; the availability of more moderate controls than those which the state has imposed; and perhaps the specific intent with which the speech or activity is launched. No matter how rapidly we utter the phrase "clear and present danger," or how closely we hyphenate the words, they are not a substitute for the weighing of values. They tend to convey a delusion of certitude when what is most certain is the complexity of the strands in the web of freedoms which the judge must disentangle.' " (Freund, On Understanding the Supreme Court (1949) p. 27, quoted in *Dennis* v. *United States, supra,* 341 U.S. at pp. 542-543 [95 L.Ed. at pp. 1169-1170] (Frankfurter, J., concurring).)

In *Dennis, supra,* the Supreme Court adopted a new expression of the test: " 'In each case [courts] must ask whether the gravity of the "evil," discounted by its improbability, justifies such invasion of free speech as is necessary to avoid the danger.' " (341 U.S. at p. 510 [95 L.Ed. at p. 1153].) But the *Dennis* formulation suffers from the same flaw, revealed in Professor Freund's comment, as the *Bridges* test: although it emphasizes the two factors of gravity and imminence of the substantive evil to be avoided by suppressing the speech in question, it does not sufficiently emphasize the importance of striking a *balance* between two *positive* values: free speech and the other values endangered by unfettered speech. Either the *Bridges* or the *Dennis* formulation of the principle—or the simple expression "clear and present danger"—is sufficient if, and only if, the court applying the rule takes into account the other factors referred to by Professor Freund.

Regardless of its faults, if any, the clear-and-present danger standard is a valuable legal instrument in balancing conflicting constitutional rights. It still has vitality. However, it is not the only tool employed by the higher courts in reviewing the validity of censorship decrees made in trial forums. Some decisions invalidating prior restraints on publication have been phrased in terms of the "public's right to an open trial." Whether framed in terms of the clear-and-present danger test or on the public's right to know, the higher courts have zealously protected the rights of a free press from the imposition of judicial restrictions on the publication of that which occurs in the course of a criminal trial. This conclusion finds support in recent decisional law.

In *Johnson* v. *Simpson* (Ky. 1968) 433 S.W.2d 644—a case which bears some analogy to the one here under review—a juvenile court referee

directed reporters of a local newspaper not to publish the names of certain witnesses who were juveniles; the order was obviously made for the purpose of protecting the youngsters' reputations; the local paper violated the order and its reporters were subsequently barred from the courtroom; a writ of mandate was obtained from the circuit court prohibiting enforcement of the order; upon subsequent review by the Kentucky Court of Appeals, the order granting the writ of mandate was affirmed; in reaching its decision, the court said, "there is no way to draw the line between merely prohibiting the publishing of the names and various other more harmful forms of censorship." (Decision premised on the public's right to an open trial.)

In *State* ex rel. *Superior Court* v. *Sperry* (1971) 79 Wn.2d 69 [483 P.2d 608], certiorari denied 404 U.S. 939 [30 L.Ed.2d 252, 92 S.Ct. 272], the trial court issued a pretrial order which barred the reporting of any matter or testimony ruled inadmissible and forbade the reporting of any matters, except those which occurred in open court and in the presence of the jury; the Washington Supreme Court held that the trial court was precluded from censoring a newspaper in advance from reporting to the public that which occurs during an open and public court proceeding and that the mere possibility of prejudicial error arising is not so important as the constitutionally guaranteed freedom of expression. (Majority opinion primarily based on Wash. Const., art. 1, § 10, providing for an "open" trial; concurring opinion relied on clear-and-present danger test.)

In *Phoenix Newspapers, Inc.* v. *Superior Court* (1966) 101 Ariz. 257 [418 P.2d 594], the judge, after holding a defendant to answer for trial, stated, "I don't want the newspapers to publish what happened here this morning." In voiding the order, the Arizona Supreme Court rationalized that a trial court could not, in advance of publication, limit the right of a newspaper to print the news and inform the public of that which had transpired in open court in the course of a judicial hearing. (Ariz. Const., art. 2, § 11, provides for an open, public trial and majority opinion rested thereon; concurring opinion also considered the clear-and-present danger test.)

A good example of the heavy presumption against the validity of a prior governmental restraint on speech or press may be found in the recent Pentagon Papers decision wherein the United States government sought to enjoin the New York Times and Washington Post from publishing the contents of a classified study entitled "History of United States Decision-Making Processes on Vietnam Policy." In rejecting the government's argument that the publication of the study would endanger our foreign policy

and jeopardize the national security, the court held that publication of the study could not be judicially restrained and in doing so made the following comments: " 'Any system of prior restraints of expression comes to this Court bearing a heavy presumption against its constitutional validity.' *Bantam Books, Inc.* v. *Sullivan,* 372 U.S. 58, 70 (1963); . . . The government 'thus carries a heavy burden of showing justification for the imposition of such a restraint.' *Organization for a Better Austin* v. *Keefe,* 402 U.S. 415, 419 (1971). The District Court for the Southern District of New York in the *New York Times* case and the District Court for the District of Columbia and the Court of Appeals for the District of Columbia Circuit in the *Washington Post* case held that the Government had not met that burden. We agree." (*New York Times Co.* v. *United States* (1971) 403 U.S. 713, 714 [29 L.Ed.2d 822, 824-825, 91 S.Ct. 2140].)

██ In applying the clear-and-present danger test to the order under review, we must decide whether the prohibition against publication of the identities of the nine prosecution witnesses may be justified in the interests of a fair trial, and whether solid evidence exists (see *Wood* v. *Georgia* (1962) 370 U.S. 375, 393-395 [8 L.Ed.2d 569, 582-583, 82 S.Ct. 1364]) to establish that this limited prior restraint on publication was necessary in order to guarantee a fair trial.

Inasmuch as fundamental constitutional rights are involved, we have made an independent examination of the entire record for the purpose of determining the integrity of the order. (See *L. A. Teachers Union* v. *L. A. City Bd. of Ed.* (1969) 71 Cal.2d 551, 557 [78 Cal.Rptr. 723, 455 P.2d 827].)

Giving full weight to the representations of the deputy district attorney and the statements and opinions of the correctional officer, the only reasonable deductions to be drawn therefrom are the following: (1) the nine inmates *might* refuse to testify if their identities were published, resulting in denial of a fair trial and a consequent miscarriage of justice; and (2) publication could present a danger of intimidation—serious injury or even death—to the prospective witnesses.

Turning to the first premise, not one inmate stated he would not testify. Not one was called and declined to testify. Not one had indicated he would not testify if his name appeared in print. Therefore, there was an utter failure of proof for the purpose of establishing the necessity of the order on fair trial principles.

First Amendment rights may not be "sacrificed" on the basis of a *possibility* (see *Craig* v. *Harney, supra,* 331 U.S. 367, 373-376 [91 L.Ed.

1546, 1550-1552]) that some evil *might* occur if the utterance is published. (See *United States* v. *Auto. Workers, supra,* 352 U.S. 567, 596 (dissenting opinion).) In short, the fears of the prosecutor and the correctional officer that the inmates would refuse to testify may be characterized only as pure speculation and did not constitute the sound, hard proof necessary to show an unfair trial would occur if the witnesses' identities were to be printed.

Nor can the order be sustained on the second prong: the intimidation theory. In the first place, the witnesses' identities were no secret; if they were eyewitnesses to the crime of which the defendants stood accused— as claimed by the prosecutor—then Hale and Mendrin had presumably been aware of their identities since the stabbing; secondly, their names were made known to the defense in the course of pretrial discovery; defense counsel candidly informed the court that they had discussed the case—and inferentially the identities of the prosecution's witnesses—with the defendants and the inmate-witnesses they intended to call; and finally, the subject witnesses obviously had to take the stand during the prosecution's case (and identify themselves) in the presence of the defendants— the very men, or their confederates, from whom retribution, if any, would be expected.

Further militating against the intimidation theory was the fact that these nine witnesses had already been placed in protective custody for reasons entirely unrelated to the Castillo killing. While it is undoubtedly true that 24 killings had occurred in the California prison system during the year immediately preceding Castillo's death, these nine men were already high-security risks in the sense that they were subject to existing danger from the remaining prison population. Consequently, the officer's opinion of enhanced danger is just not persuasive.

From our analysis of this case, the conclusion is inescapable that a prior restraint on publication in the name of a fair trial should rarely be employed against the communications media for the following cogent reasons: (1) The historical background of the current fair trial-free press issue reflects that it arose in a relatively few "sensational" jury cases which generated great public interest. On the other hand, the vast majority of criminal actions (such as the one under review) excite little, if any, public interest and receive minimum coverage. Ordinarily, it is only the most unusual criminal matter—the outrageous offense or one involving a prominent victim or an infamous defendant—that generates public attention; and (2) even in the infrequent notorious case, a prior restraint on publication should be considered only upon presentation of strong proof that the pub-

lication sought to be restrained meets the clear-and-present danger standard. In balancing the constitutional right to a fair trial against the rights of a free press, it should be emphasized that sufficient legal safeguards presently exist to assure the defendant of a fair trial—e.g., change of venue, *voir dire* examination and challenge of prospective jurors, jury sequestration, mistrial, new trial, appeal and habeas corpus. On the other hand, in only an insignificant number of cases does the publicity factor affect the prosecution's right to due process. In those instances, the vast financial resources and manpower available to the government for investigating and litigating criminal actions, as well as for counteracting any unfavorable publicity, should likewise be kept firmly in mind before the issuance of any order amounting to a direct prior restraint on publication.

Let a peremptory writ of mandate issue directing the superior court to vacate and set aside its order re publicity dated October 31, 1972, prohibiting petitioners and other news media from publishing the names and photographs of the incarcerated prosecution witnesses in the case of People v. Mendrin and Hale, action No. CRW-2675; it is further ordered that the alternative writ of mandate be, and it is hereby, discharged.

Gardner, P. J., and Gabbert, J., concurred.

A petition for a rehearing was denied January 24, 1973, and respondent's petition for a hearing by the Supreme Court was denied March 23, 1973.