[L.A. No. 30316. In Bank. Mar. 4, 1975.]

OLIVER WENDELL WILSON et al., Petitioners, v.
THE SUPERIOR COURT OF LOS ANGELES COUNTY, Respondent;
PHILIP E. WATSON, Real Party in Interest.

## COUNSEL

Freeman, Kelso & Young and Nancy Kelso for Petitioners.

No appearance for Respondent.

Simon, Sheridan, Murphy, Thornton & Hinerfeld, John D. Cahill and Michael R. Rogers for Real Party in Interest.

## OPINION

**MOSK, J.**—In *Gertz* v. *Robert Welch, Inc.* (1974) 418 U.S. 323, 325 [41 L.Ed.2d 789, 797, 94 S.Ct. 2997], Justice Powell began by observing that "This Court has struggled for nearly a decade to define the proper accommodation between the law of defamation and the freedoms of speech and press protected by the First Amendment." Growing public awareness of the need for integrity in the election process has added to the judicial task: in this case we are called upon to determine whether a

court may constitutionally enjoin the publication of allegedly misleading and libelous statements made by a candidate for political office about his opponent.

Petitioner was a candidate for the office of Assessor of Los Angeles County in the primary election held on June 4, 1974. In connection with that campaign, he distributed a leaflet entitled "Newsletter," dated "April, May, June, 1974," in which he reprinted portions of three articles from the Los Angeles Times. Two of the articles on the first page of the circular related that petitioner's opponent, the incumbent assessor Philip E. Watson, had been indicted for bribery and that his aide had been placed on probation for the misuse of campaign funds. The articles bore no date; they had actually appeared in the Times in 1966 and 1967. A second page of the Newsletter contained a portion of another article from the Times headlined, "Watson Bribery Case Slated for Trial Today." Above the article was the date "April 26, 1967," but either deliberately or inadvertently the printing was blurred and difficult to decipher. The Newsletter did not mention that Watson had been acquitted at the trial. The circular also contained statements concerning the qualifications of petitioner for the office he sought and a summary of his proposed program, and it solicited funds "to prevent the type of corruption and 'special interest' control that we have suffered over the years."

On April 15, 1974, Watson filed a complaint seeking damages for libel and slander and an injunction to restrain petitioner from further publication of the Newsletter. At a hearing held that same day, the trial court told petitioner's attorney that petitioner was not "presenting a clear picture to the voters when he doesn't indicate when all this took place nor indicate the fact that the accused was apparently acquitted on all of these charges," that petitioner has "every right to state the truth, but not a portion of the truth, or . . . a narrow view of the truth, which may well be a falsehood," and that while a "full and fair and factual presentation of the truth" would not be circumscribed "this document certainly doesn't do it." Petitioner insisted that he had a constitutional right to publish the material in question.

The trial court issued a temporary restraining order enjoining petitioner and any of his agents or employees "and all persons acting in concert and participation with them" from "printing, posting, publishing, and distributing" the Newsletter "or written or oral statements substantially similar" to those made in the Newsletter. The court also ordered petitioner to show cause why he should not be enjoined from such publication while the libel action was pending.

Thereafter, petitioner amended the Newsletter as follows: in one version he added the dates "12/1/66" and "3/30/67" to the two articles on the first page, but did not clarify the date on the second page above the article referring to Watson's bribery trial. In another edition of the circular he added a reprinted article on the second page dated "5-9-67" which stated that Watson had been acquitted of the charges, and in a fourth version he inserted yet another article dated "5-5-67" stating that Watson had been acquitted of the charges because of insufficient evidence.

On April 30 the motion for a preliminary injunction came on for hearing. Over petitioner's protest that enjoining publication of the Newsletter would amount to an unconstitutional prior restraint, the court declared that it would not prevent petitioner from bringing Watson's history before the public but that this must be done "in such a manner that the average voter, looking at that will understand that they are not current articles." The court suggested that the numerical references to the date in the later versions of the Newsletter might appear to the average person to be a file number rather than a date, and that each article should state that it is reprinted from a named newspaper, should spell out the month, date and year in full, and that the fact of Watson's acquittal should be printed in the same size type as the reference to the bribery charge.

A preliminary injunction was issued in terms substantially similar to the restraining order, except that the injunction was effective during the pendency of Watson's action, and included the later versions of the Newsletter in its scope. The injunction also added that newspaper articles concerning plaintiff must be presented in a "fair and balanced manner with a full presentation of the facts" and must be accompanied by a statement of the source of the article, and its full date, without abbreviation, and that reprinted articles "must be placed in a position to give a balanced presentation of the facts."

Petitioner thereafter instituted this proceeding, seeking a writ of prohibition to prevent the trial court from enforcing the restraining order and the injunction.[1] We issued an alternative writ on May 31, 1974.

The principles applicable to this case are well settled. More than four

---

[1]Although petitioner seeks to prevent enforcement of both the temporary restraining order and the preliminary injunction, the order is merged in the injunction (*City of Los Angeles* v. *Superior Court* (1925) 196 Cal. 445, 449 [238 P. 670]), and our determination will thus be confined to the validity of the injunction.

decades ago, the United States Supreme Court in *Near* v. *Minnesota* (1931) 283 U.S. 697 [75 L.Ed. 1357, 51 S.Ct. 625], declared that prior restraint upon publications which refer to the malfeasance of public officers would violate the guarantees of the First Amendment to the United States Constitution. A Minnesota statute provided for the abatement, as a public nuisance, of a "malicious, scandalous and defamatory newspaper, magazine or other periodical." The defendant was enjoined under the statute from publishing a newspaper charging that certain public officials participated in graft, were controlled by gangsters, and had grossly neglected their duties.

The court reversed the judgment, declaring: "In determining the extent of the constitutional protection, it has been generally, if not universally, considered that it is the chief purpose of the guaranty [of a free press] to prevent previous restraints upon publication. . . . That liberty was especially cherished for the immunity it afforded from previous restraint of the publication of censure of public officers and charges of official misconduct. . . . The fact that for approximately one hundred and fifty years there has been almost an entire absence of attempts to impose previous restraints upon publications relating to the malfeasance of public officers is significant of the deep-seated conviction that such restraints would violate constitutional right. . . . The recognition of authority to impose previous restraint upon publication in order to protect the community against the circulation of charges of misconduct, and especially of official misconduct, necessarily would carry with it the admission of the authority of the censor against which the constitutional barrier was erected." (283 U.S. at pp. 713, 717, 718, 721 [75 L.Ed. at pp. 1366, 1368, 1369, 1370].)

These principles have retained their vigor from 1931 to date. ■
From *Near* to *Times-Picayune Pub. Corp.* v. *Schulingkamp* (1974) 419 U.S. 1301, 1307 [42 L.Ed.2d 17, 22, 95 S.Ct. 1], it has been consistently held that any prior restraint on expression bears a heavy presumption against its constitutional validity. A recent case declined to restrain publication of the so-called "Pentagon Papers" despite the urging of the government that the publication would result in a serious breach of national security (*New York Times Co.* v. *United States* (1971) 403 U.S. 713 [29 L.Ed.2d 822, 91 S.Ct. 2140]),[2] and an attempt to restrain distribution of a

---

[2]Watson attempts to distinguish *New York Times Co.* v. *United States* on the ground that it involved the publication of "current news" whereas petitioner published seven-year-old excerpts from newspaper articles misrepresented as current news. Obviously, the question whether the published material relates to contemporary or historical events cannot be decisive.

pamphlet criticizing a real estate broker for his selling practices has likewise been held improper (*Organization for a Better Austin* v. *Keefe* (1971) 402 U.S. 415 [29 L.Ed.2d 1, 91 S.Ct. 1575]). (See also *Miami Herald Publishing Co.* v. *Tornillo* (1974) 418 U.S. 241 [41 L.Ed.2d 730, 94 S.Ct. 2831]; *Town of Lantana* v. *Pelczynski* (Fla. 1974) 303 So.2d 326.)

The overriding significance of these precepts was emphasized in *New York Times Co.* v. *Sullivan* (1964) 376 U.S. 254, 279-280 [11 L.Ed.2d 686, 706-707, 84 S.Ct. 710, 95 A.L.R.2d 1412], in which it was held that a public official may not recover damages for a defamatory falsehood relating to his official conduct unless he proves that the statement was made with actual malice. In its opinion, the court characterized as a "profound national commitment" the principle that debate on public issues must be "uninhibited, robust, and wide-open, and that it may well include vehement, caustic, and sometimes unpleasantly sharp attacks on government and public officials." (376 U.S. at p. 270 [11 L.Ed.2d at p. 701].) ■ These authorities leave no doubt that the truth or falsity of a statement on a public issue is irrelevant to the question whether it should be repressed in advance of publication.

A protective provision more definitive and inclusive than the First Amendment is contained in our state constitutional guarantee of the right of free speech and press. Section 2 of article I of the California Constitution provides, "Every person may freely speak, write and publish his or her sentiments on all subjects, being responsible for the abuse of this right. A law may not restrain or abridge liberty of speech or press." This court's interpretation of the provision is exemplified by the early case of *Dailey* v. *Superior Court* (1896) 112 Cal. 94 [44 P. 458], in which we annulled an order restraining the performance of a play relating to a pending trial. In this state we have consistently viewed with great solicitude the right to uninhibited comment on public issues. (See, e.g., *Sun Co. of San Bernardino* v. *Superior Court* (1973) 29 Cal.App.3d 815 [105 Cal.Rptr. 873]; *People* v. *American Automobile Ins. Co.* (1955) 132 Cal.App.2d 317 [282 P.2d 559].)

There can be no doubt that the preliminary injunction here constituted a prior restraint on publication. Not only was petitioner prohibited from publishing and distributing any of the four versions of the Newsletter but he was forbidden to publish statements "substantially similar" to those made in the circular. The preliminary injunction went even further in prohibiting the publication of any articles about Watson unless they were presented in a "fair and balanced manner with a full presentation of the facts," and the court went so far as to prescribe in

some detail its theory of what constitutes a fair and balanced presentation.

Watson attempts to justify the orders on various grounds. He claims that there was no prior restraint here because the court did not prohibit discussion of his background but only enjoined deceptive use of the articles. This amounts to an assertion that no unconstitutional prior restraint occurred because petitioner was permitted to publish true statements, fairly presented, and was only enjoined from a purportedly deceptive presentation. The concept that a statement on a public issue may be suppressed because it is believed by a court to be untrue is entirely inconsistent with constitutional guarantees and raises the spectre of censorship in a most pernicious form.

Chief Judge Lumbard made this abundantly clear in *Crosby* v. *Bradstreet Company* (2d Cir. 1963) 312 F.2d 483, 485, cert. den., 373 U.S. 911 [10 L.Ed.2d 412, 83 S.Ct. 1300], when he held that publication of information about a person, "without regard to truth, falsity, or defamatory character of that information," was not subject to prior restraint. Chief Justice Burger in *Miami Herald Publishing Co.* v. *Tornillo, supra,* refused to permit governmental interference with a publication's "content . . . and treatment of public issues and public officials—whether fair or unfair . . . ." (418 U.S. at p. 258 [41 L.Ed.2d at p. 741].)

Watson relies upon cases which state that libelous pronouncements are not protected by the United States Constitution (*Beauharnais* v. *Illinois* (1952) 343 U.S. 250, 266 [96 L.Ed. 919, 932, 72 S.Ct. 725]; *Smoot* v. *Fox* (6th Cir. 1965) 353 F.2d 830, 833) and are subject to prior restraint (*Anderson* v. *Dean* (N.D.Ga. 1973) 354 F.Supp. 639, 642). Whether or not these cases, particularly the latter district court decision, are viable, the rule they purport to invoke is inapplicable here. In *New York Times Co.* v. *Sullivan, supra,* 376 U.S. 254, 268 [11 L.Ed.2d 686, 699], the United States Supreme Court distinguished such cases on the ground that they did not involve criticism of the official conduct of public officials. The court held that "libel can claim no talismanic immunity from constitutional limitations. It must be measured by standards that satisfy the First Amendment." (376 U.S. at p. 269 [11 L.Ed.2d at p. 700].)

Watson next asserts that the *Near* rationale is inapplicable because the reprinting of newspaper articles does not constitute political discussion. But the mere fact that petitioner chose this type of format, rather than the typical narrative method, to bring his concept of

Watson's background to the attention of the voters can have no significant effect upon the status of the articles as a form of political presentation. Indeed, as Chief Justice Hughes wrote in *Lovell* v. *Griffin* (1938) 303 U.S. 444, 452 [82 L.Ed. 949, 954, 58 S.Ct. 666], "The press in its historic connotation comprehends every sort of publication which affords a vehicle of information and opinion."

■ Even if the Newsletter constitutes protected speech, argues Watson, the injunction was justified because its publication presents a clear and present danger of a substantive evil since the circulation of misleading charges against a candidate interferes with the democratic voting process. The cases establish that "the substantive evil must be extremely serious and the degree of imminence extremely high before utterances can be punished." (*Bridges* v. *California* (1941) 314 U.S. 252, 263 [86 L.Ed. 192, 203, 62 S.Ct. 190, 159 A.L.R. 1346].) We think it evident that if publication of the Pentagon Papers did not constitute a sufficiently serious threat to justify creation of an exception to the established principles set forth above, the circulation of election campaign charges, even if deemed extravagant or misleading, does not present a danger of sufficient magnitude to warrant a prior restraint.

Another argument of Watson is that the speech elements of the Newsletter are merely incidental to conduct, i.e., the activity of "deceptive campaign practices," and that, therefore, petitioner does not enjoy "unlimited First Amendment protection." Petitioner, like the defendant in *Near,* did no more than publish and distribute a circular relating to the conduct of a public official. It would be anomalous if the mere fact of publication and distribution were somehow deemed to constitute "conduct" which in turn destroyed the right to freely publish. There is, of course, similar "conduct" involved in the circulation of every daily newspaper and in its treatment of political affairs. ■ As Justice Black wrote for the court in *Mills* v. *Alabama* (1966) 384 U.S. 214, 218-219 [16 L.Ed.2d 484, 488, 86 S.Ct. 1434]: "Whatever differences may exist about interpretations of the First Amendment, there is practically universal agreement that a major purpose of that Amendment was to protect the free discussion of governmental affairs. This of course includes discussions of candidates, structures and forms of government, the manner in which government is operated or should be operated, and all such matters relating to political processes."

The circumstances of this paradigmatic case, inspired by the emotions of a political campaign, demonstrate the wisdom of, and the need for, the rule prohibiting prior restraints. In the hearings which led to the

injunction, the trial court informed petitioner that he had the right to state the "truth" but not "a narrow view of the truth, which may well be falsehood," and suggested changes in the Newsletter in the "interest of fairness," such as the size of type which would be suitable.

After the restraining order was issued, Watson sought a contempt citation against petitioner on the ground that the later versions of the circular did not comply with the order. Petitioner appeared personally before the court in connection with the alleged contempt. He stated that he was in the position of "not knowing where he stands with respect to the publication" of the Newsletter, that he wished to "explain to the Court . . . how he has attempted to comply" with the order, and he requested the court's guidance as to the character of publication which would be acceptable because he feared that if he attempted to make additional changes in the Newsletter another injunction might issue. Between the time petitioner filed his petition for a writ of prohibition and our issuance of an alternative writ, petitioner agreed, in the hearing on the order to show cause regarding the contempt, that he would refrain from distributing any of the four editions of the Newsletter until after the election, and that he would be guilty of contempt if such publication occurred.

■ Thus, petitioner was placed in the untenable position of speculating on whether his attempts to comply with the court orders were satisfactory or whether additional versions of the Newsletter would also be repressed. The result was not merely a theoretical chilling of his right to publish, but actual acquiescence by him, under threat of contempt, in refraining from future publication of any of the four versions of the circular. (*Crosby* v. *Bradstreet Company, supra,* 312 F.2d at p. 485.) By the restraining order the court also devised for itself an intolerable role: it was called upon to determine whether various versions of the Newsletter presented "too narrow a view of the truth" and whether successive publications were "substantially similar" to the original circular. It even went so far as to specify such details of publication as the size of type which would give a "fair" presentation. The court thus aggressively assumed the role of governmental censor, approving its version of a "fair" presentation, and disapproving a "too narrow view of the truth."

We do not intend to imply approval of the dubious tactics employed by petitioner in the Newsletter or to suggest that prior restraint upon publication can never be justified. The decisions recognize that prior restraints may be imposed under some extraordinary circumstances. For example, it has been said that the government may prohibit the

disclosure of military secrets in time of war and prevent the utterance of words that may have the effect of force. (See, e.g., *Near* v. *Minnesota, supra,* 283 U.S. 697, 716 [75 L.Ed. 1357, 1367-1368].) Furthermore, an injunction restraining speech may issue in some circumstances to protect private rights (see, e.g., *Magill Bros.* v. *Bldg. Service etc. Union* (1942) 20 Cal.2d 506, 511-512 [127 P.2d 542]) or to prevent deceptive commercial practices (*Securities and Exchange Comn.* v. *Texas Gulf Sulphur Co.* (2d Cir. 1971) 446 F.2d 1301, 1306). However, we have not discovered any case upholding the power of a court to restrain publication of a statement regarding the official conduct of a public officer on the ground that the statement was not wholly true or was presented in a deceptive manner. The judiciary has been ever mindful of Thomas Jefferson's aphorism that "error of opinion may be tolerated when reason is free to combat it."

We hold, therefore, that the preliminary injunction violated petitioner's rights of freedom of expression under the United States Constitution, and for an independent ground, under the broader terms of the California Constitution. The orders must be annulled.

Our conclusion renders it unnecessary to discuss petitioner's additional contention that the injunction is unconstitutionally vague.

Subsequent to our issuance of the alternative writ of prohibition, petitioner filed a supplemental brief urging us to hold that an action for defamation will not lie based upon election campaign criticism or the public conduct of a public official. It is urged that an absolute privilege is essential to assure debate on matters of concern to the electorate. We are not required to reach this issue in the present case since we are called upon to decide only the validity of the orders imposing a restraint on the publication of the Newsletter; the validity of Watson's underlying action for libel and slander is not appropriately before us at this time.

Let the peremptory writ issue.

Wright, C. J., McComb, J., Tobriner, J., Sullivan, J., Clark, J., and Richardson, J., concurred.