[Civ. No. 48235. Second Dist., Div. One. Nov. 30, 1977.]

THE PEOPLE EX REL. JOHN K. VAN DE KAMP, as District Attorney, etc., Plaintiff and Appellant, v. AMERICAN ART ENTERPRISES, INC., et al., Defendants and Respondents.

524

### Counsel

John K. Van de Kamp, District Attorney, Harry B. Sondheim, Donald J. Kaplan, Thomas K. Elden and Dirk L. Hudson, Deputy District Attorneys, for Plaintiff and Appellant.

Fleishman, Brown, Weston & Rohde, Stanley Fleishman and David M. Brown for Defendants and Respondents.

### Opinion

**THOMPSON, J.**—This appeal presents issues of apparent first impression. We are called upon to determine: (1) the applicability of California's Red Light Abatement Law (Pen. Code, §§ 11225-11235) to premises occupied by a publisher and used for the storage and distribution of printed matter conceded to be not obscene; and (2) the scope of injunctive relief permissible if the law is applicable. Based upon a record which establishes that the premises used for publication are also "a nerve center" for prostitution related to publication, we conclude that the Red Light Abatement Law applies. We conclude further that

injunctive relief pursuant to the law must be limited in scope so that infringement upon First Amendment protection is no greater than that which government proves essential to prevention of the use of the premises to promote prostitution.

Because the trial court determined that despite its finding that the premises were a prostitution "nerve center" the Red Light Abatement Law did not apply and did not make findings on the factual predicate for extent of applicability despite evidence that conclusively supports an injunction limited in scope, we reverse a judgment for defendants in the case at bench.

## Facts[1]

A building on Lassen Street in Chatsworth, California, is used as the headquarters of various entities constituting a corporate empire engaged in the publication and distribution of pornographic materials. The editorial, publication, administration, art, and photographic development activity of the entities are housed in 20,000 square feet of the 120,000-square foot building with the remainder devoted to storage of books, magazines, and photographs. One-third of the stored material consists of photographs of explicit sexual activity, one-third photographs of simulated sex, and one-third printed material without photographs. At least 100 people are employed on the premises.

American Art Enterprises, the umbrella entity, employs staff photographers. Working from the Lassen Street headquarters, those photographers, through model agencies, engage the services of men and women who perform sexual intercourse in every conceivable variant, and who are photographed in their activity. The photographed activity does not occur in the Lassen Street building. Male models are paid an average of $35 for their services, and female models $50. The photographs are taken for use in publications of American Art and its associated companies. A typical example of the use and payment of models is described in *People v. Fixler* (1976) 56 Cal.App.3d 321 [128 Cal.Rptr. 363]. The *Fixler* situation has been repeated hundreds of times at the instance of photographers operating from the Lassen Street building.

---

[1]We eschew the appeal to prurient interest contained in the detail of sexual conduct in the fact statement of the concurring and dissenting opinion.

### Proceedings in Trial Court

Acting pursuant to Penal Code sections 11225 and 11230, the District Attorney of Los Angeles County filed a complaint seeking closure of the Lassen Street building to abate a statutory nuisance as defined in those sections. The trial court found that the building is used as a "nerve center" for prostitution, amplifying that finding with others concerning the detail of the use of the building to secure the performance of sexual activity for hire. The court concluded, however, that the premises are not "used for the purpose of prostitution," as that term is employed in Penal Code section 11225, and that a building used for publication and distribution of books and magazines is not subject to the Red Light Abatement Law.

### Nature of Appeal

This appeal by the district attorney followed. The district attorney emphasizes at the outset that the case at bench does not involve obscenity. We are required, therefore, to consider it in the context that the publishing activity at the Lassen Street building is constitutionally protected.

### Red Light Abatement Law

Penal Code section 11225 states: "Every building or place used for the purpose of . . . lewdness, assignation, or prostitution, and every building or place in . . . which acts of . . . lewdness, assignation, or prostitution, are held to occur, is a nuisance which shall be enjoined, abated and prevented, whether it is a public or private nuisance." The section is worded to define as a nuisance places "used for the purpose of prostitution" as well as places where "acts of prostitution" occur. Hence, premises where acts of prostitution are arranged to be consummated elsewhere are subject to abatement under the law. (*People* v. *Barbiere* (1917) 33 Cal.App. 770 [166 P. 812]; *People* v. *McGonigle* (1942) 56 Cal.App.2d 17 [132 P.2d 7].)

Penal Code section 11230 provides: "If the existence of a nuisance is established in an action as provided in this article, an order of abatement shall be entered as a part of the judgment in the case, directing the removal from the building or place of all fixtures . . . and movable property used in conducting, maintaining, aiding or abetting

the nuisance, and directing the sale thereof . . . and the effectual closing of the building or place against its use for any purpose, and that it be kept closed for a period of one year, unless sooner released." While worded in mandatory terms, section 11230 is construed as not requiring the closure of a building found to be a statutory nuisance or the removal and sale of property located in it. Rather, the trial court adjudicating the complaint to establish the existence of the statutory nuisance is treated as vested with a broad discretion to fashion an appropriate remedy for abatement. (*Selowsky* v. *Superior Court of Napa Co.* (1919) 180 Cal. 404 [181 P. 652].)

██ The sexual intercourse for hire by the models whose activity is photographed for the publications of the American Art empire is prostitution. (*People* v. *Fixler, supra,* 56 Cal.App.3d 321.) The findings of the trial court to the effect that the Lassen Street building is the "nerve center" for arranging the hundreds of acts of prostitution establishes that the building is a place used for the purpose of prostitution.

Thus, absent a constitutional restriction, the Lassen Street building is subject to the provisions of the Red Light Abatement Law. The provisions permit a broad scope of injunctive relief designed to abate the use of the building for the proscribed purpose.

*Constitutional Restriction*

There is a necessary tension in application of the Red Light Abatement Law to premises used for constitutionally protected publication. Resolution of that tension depends upon the extent to which the application restrains speech or press itself as contrasted with restraining conduct related to speech.

██ █ Where governmental activity designed to prevent a social evil by restraint upon speech or press itself collides with the First Amendment and article I, section 2 of the California Constitution[2] in a fashion where either freedom of speech and press or the activity of government necessarily must yield, the constitutional guarantees prevail. In the words of the United States Supreme Court: "The First Amendment would . . . be a hollow promise if it left government free to destroy or erode its guarantees by indirect restraints so long as no law is passed

[2]The California guarantee is more inclusive than the First Amendment. (*Wilson* v. *Superior Court* (1975) 13 Cal.3d 652, 658 [119 Cal.Rptr. 468, 532 P.2d 116].)

that prohibits free . . . press . . . . We have . . . repeatedly held that laws which actually affect the exercise of [this] vital [right] cannot be sustained merely because they were enacted for the purpose of dealing with some evil within the State's legislative competence, or even because the laws do in fact provide a helpful means of dealing with such an evil." (*Mine Workers* v. *Illinois Bar Assn.* (1967) 389 U.S. 217, 222 [19 L.Ed.2d 426, 430, 88 S.Ct. 353].)

The rule of primacy of the First Amendment has been applied in California to invalidate an attempt at prior restraint of speech and press disguised as abatement of nuisance in the form of obscenity. (*People* ex rel. *Busch* v. *Projection Room Theater* (1976) 17 Cal.3d 42 [130 Cal.Rptr. 328, 550 P.2d 600], cert. den., 429 U.S. 922 [50 L.Ed.2d 289, 97 S.Ct. 320] *sub nom. Van De Kamp, District Attorney of Los Angeles County* v. *Projection Room Theater.*) The principle prohibits the denial of a license to operate a book store because of prior activity in distribution of obscenity. (*Perrine* v. *Municipal Court* (1971) 5 Cal.3d 656 [97 Cal.Rptr. 320, 488 P.2d 648], cert. den., 404 U.S. 1038 [30 L.Ed.2d 729, 92 S.Ct. 710] *sub nom. Municipal Court of East Los Angeles Judicial District, County of Los Angeles* v. *Perrine.*)

■ Where, however, application of governmental restriction designed to regulate socially evil conduct rather than speech or press itself creates an indirect tension with the First Amendment and its California equivalent, a different principle applies. Then, "[the] government regulation is sufficiently justified if it is within the constitutional power of the Government; if it furthers an important or substantial governmental interest; if the governmental interest is unrelated to the suppression of free expression; and if the incidental restriction on alleged First Amendment freedoms is no greater than is essential to the furtherance of that interest." (*United States* v. *O'Brien* (1968) 391 U.S. 367, 377 [20 L.Ed.2d 672, 680, 88 S.Ct. 1673]; see also *Crownover* v. *Musick* (1973) 9 Cal.3d 405, 422-423 [107 Cal.Rptr. 681, 509 P.2d 497], cert. den., 415 U.S. 931 [39 L.Ed.2d 489, 94 S.Ct. 1443] *sub nom. Owen* v. *Musick, Sheriff.*)

Thus the special interest of the state in controlling the sale of alcoholic beverages (*California* v. *LaRue* (1972) 409 U.S. 109 [34 L.Ed.2d 342, 93 S.Ct. 390]) validates action under the Red Light Abatement Law closing a bar for lewd conduct of its dancers, arguably symbolic expression but incidental only to a primary purpose of expanding sales of alcohol.

(*People* ex rel. *Hicks* v. *Sarong Gals* (1974) 42 Cal.App.3d 556 [117 Cal.Rptr. 24].)

*Application to Case at Bench*

The governing constitutional principles distill to two propositions particularly apt here. ■ Because the publishing activity conducted at the Lassen Street building constitutes virtually the sole purpose for which the building is used and it is conceded that obscenity is not involved, closure of the building and removal of property from it is an unconstitutional prior restraint upon protected speech and press itself. (*People* ex rel. *Busch* v. *Projection Room Theater, supra,* 17 Cal.3d 42, 59; cf. *Art Theater Guild, Inc.* v. *Ewing* (1975) 421 U.S. 923 [44 L.Ed.2d 82, 95 S.Ct. 1649] dismissing an appeal for want of a substantial federal question rejected by the California Supreme Court in *Projection Room Theater.*) Nevertheless, conduct connected with the publishing activity may be regulated to the extent regulation furthers an important or substantial governmental interest unrelated to speech or press and if the restriction upon freedom of speech and press incidental to the regulation is no greater than is essential to the furtherance of that interest.

■ Prostitution and its related commercial endeavor of pandering may be prohibited to further a substantial governmental interest. (*People* v. *Osuna* (1967) 251 Cal.App.2d 528, 532 [59 Cal.Rptr. 599].) The governmental interest in preventing that conduct is unrelated to speech or press. Granted that the burden is on the state to prove here that regulation of the prohibited conduct does not create an incidental infringement upon First Amendment rights which is "greater than [that] essential to vindicate its . . . interests" (*Bursey* v. *United States* (9th Cir. 1972) 466 F.2d 1059, 1083), the record establishes conclusively that some regulation pursuant to the Red Light Abatement Law is appropriate.

Because of the broad scope of injunctive relief available pursuant to the Red Light Abatement Law, the court could, for example, have enjoined use of the premises to arrange acts of prostitution. Conceivably broader injunctive relief is appropriate depending upon findings of fact concerning the necessity of the relief and its impact upon publishing activity. Because the trial court concluded that the Red Light Abatement Law was not applicable at all and that the premises were not used for the purpose of prostitution, the necessary findings were not made.

*Disposition*

The judgment is reversed. Appellant-People also appeal from an order dissolving a preliminary injunction and from a "post judgment order" denying a motion to vacate the judgment and enter a new one. Because the passage of time since the preliminary injunction was dissolved renders further proceedings in the trial court more appropriate than action by this court reinstating the injunction in its original form, the order dissolving the preliminary injunction is affirmed. The appeal from the "post judgment order" is dismissed.

Lillie, Acting P. J., concurred.

HANSON, J.—I concur in the judgment except for that portion which may be construed as placing restrictions on the trial court in respect to the scope of relief which may be imposed under the remedial provisions of the Red Light Abatement Law, Penal Code section 11225 et seq. (hereinafter § 11225 et seq.).

I would reverse the judgment and order dismissing the action, denying appellant all relief, dissolving the preliminary injunction, expunging the notice of lis pendens, and awarding respondents costs from appellant, and remand the matter to the trial court to conduct the necessary additional factual inquiries which will result in granting relief, the scope of which will accomplish the purpose of the Red Light Abatement Law.

A tremendous amount of time and effort has been expended by counsel and the court below on this case.[1] The case satisfies two of the three criteria for publication under California Rules of Court, rule 976(b), in that it is one of first impression and involves legal issues of continuing public interest. The foregoing calls for something more than a

---

[1]The register of actions reflects that during the three years this case was in the superior court (between Aug. 22, 1972, to the time of the filing of notice of appeal on July 14, 1975) there were about 225 entries made of legal documents filed, motions and court appearances including about 20 days of court trial, the foregoing being exclusive of 2 separate petitions filed in the Court of Appeal. The reporter's transcript of the trial consists of 9 volumes containing over 2,000 pages of testimony. There are 384 exhibits (plaintiff's—223; defendants'—161). There were 32 exhibits introduced into evidence by reference from the trial of the case of *People v. Fixler* (1976) 56 Cal.App.3d 321 [128 Cal.Rptr. 363].

quick brush. The factual basis and legal authority for the holdings need amplification.

My opinion follows:

THE CASE

This action was brought by the People pursuant to the provisions of the Red Light Abatement Law (§ 11225 et seq.) to abate certain nonresident premises at 21300, 21314 and 21322 Lassen Street in the Chatsworth area of Los Angeles County (hereinafter the Lassen Street premises) owned, occupied and operated by the captioned defendants /respondents (hereinafter collectively referred to as American Art). American Art is a publisher of hard core pornographic materials. The action asserts that the Lassen Street premises were a place "used" for the purposes of lewdness, assignation, and prostitution constituting a public nuisance and sought a permanent injunction, one year's closure of the premises, and the sale of all furniture, fixtures, and movable property used to carry out the nuisance.[2]

Following a protracted legal struggle, the superior court judgment ordered the complaint dismissed as to certain defendants. It also decreed that the People "take nothing by their Complaint from Defendants AMERICAN ART ENTERPRISES, INC., a corporation, WORLD NEWS, INC. dba PACIFIC NEWS, a corporation, PARLIAMENT NEWS, INC., a corporation, SEVEN TOWERS, INC. dba ACADEMY PRESS and SOCIO LIBRARY, a corporation, LONDON PRESS, INC., a corporation, LONDON PRESS, INC. dba OXFORD BINDERY, a corporation, REMCOR, a partnership, REMCOR, a joint venture, MILTON LUROS, BEATRICE LUROS, LARRY B. PARKER, PAUL WISNER, WILBUR HULSEY, STANLEY SOHLER, KEITH BANCROFT, IRIS BANCROFT, RITA GROSSMAN, LLOYD FRED PULSTER, HOWARD GREEN," and with respect to the Lassen Street premises. It dissolved the

---

[2]Sergeant Henry J. Petroski, Jr., an investigator of the Los Angeles Police Department assigned to the administrative vice division and in charge of the investigation concerning the Lassen Street premises owned and operated by American Art, testified that on April 18, 1972, while he was in the Lassen Street building serving a search warrant he saw file cabinets in the photo library on the second floor containing "several thousand" file cards on "models," male and female, with photographs in the nude and saw vouchers for payment of the "models" to engage in explicit sexual activities; that he thought from those observations that the Lassen Street premises were being used for the purposes of prostitution; that a special task force went into effect to investigate the activities at the premises at the end of May 1972; and that they directed their investigation toward violations of the Red Light Abatement Law since it was his opinion that obscenity prosecutions would not curb the sex modeling (prostitution) operations of American Art.

preliminary injunction and expunged the notice of lis pendens, and granted costs in favor of defendants.

The People "appeal from the entire judgment under Code of Civil Procedure section 904.1(a) and also from that portion of the judgment dissolving the preliminary injunction under Code of Civil Procedure section 904.1(f) . . . and from the post-judgment order of the court denying plaintiff's motion under Code of Civil Procedure section 663 to vacate the judgment and enter a new judgment."

## THE FACTS

The "flow chart," attached as Appendix A (see diagram, *post,* at p. 553) introduced into evidence as plaintiff's exhibit No. 9, depicts the interrelationship between American Art's ownership, editors, photo department, photographers, the "model" agencies, and the "models" hired by American Art to engage in sexually explicit conduct.

Following the 20-day nonjury trial, the trial court made the following pertinent "findings of fact," all of which are supported by substantial evidence:

### Trial Court Findings of Fact

That defendants American Art Enterprises, Inc., World News, Inc., Parliament News, Inc., Seven Towers, Inc., and London Press, Inc. are California corporations; that defendant World News, Inc. does business as Pacific News, defendant Seven Towers, Inc. did business as Academy Press and Socio Library, and London Press, Inc. does business in its own name and as Oxford Bindery;

That the Lassen Street premises contain a commercial structure which, since January 1972, has contained the offices, warehouse and facilities used by defendants American Art Enterprises, Inc., Seven Towers, Inc., Parliament News, Inc., and World News, Inc. dba Pacific News; that defendants American Art Enterprises, Inc., a corporation, World News, Inc. dba Pacific News, a corporation, Parliament News, Inc., a corporation, Seven Towers, Inc. dba Academy Press and Socio Library, a corporation, Remcor, a partnership, Remcor, a joint venture, Milton Luros, Beatrice Luros, Larry B. Parker, Paul Wisner, Wilbur Hulsey, Stanley Sohler, Keith Bancroft, Iris Bancroft, Rita Grossman, and Howard Green, have interests in the premises; that defendants London

Press, Inc., a corporation, London Press, Inc. dba Oxford Bindery, a corporation, and Lloyd Fred Pulster have no interest in the premises;

That American Art Enterprises, Inc. and Seven Towers, Inc. dba Academy Press and Socio Library are publishers of books and magazines;

That Parliament News is a national distributor of books and magazines, some of which are published by American Art Enterprises and Seven Towers, and some of which are published by companies not defendants in this action;

That World News, Inc. dba Pacific News is a local distributor of books and magazines in the Los Angeles area, some of which are published by American Art Enterprises and Seven Towers, and some of which are published by companies not defendants in this action;[3]

---

[3] *Ownership, Organization, Structure and Control of American Art*: Witness Robert Reitman, president of American Art up to July 1971, testified substantially as follows: that he went to work for the organization when it was known as Jaybird Publications; that it later changed its name to American Art Enterprises, Incorporated; that the operations were initially spread between several buildings in the North Hollywood area but in order to consolidate the operations and obtain more space it moved under one roof to the Lassen Street premises in early 1972; that as president of American Art he took orders from Milton Luros and Beatrice Luros, who were the principal stockholders of the company; that he attended weekly meetings with the Luroses which were attended by other individuals connected with other titled corporations, and Milton Luros gave directions to all those attending these meetings; that one of the persons who he recalled attended the weekly meetings was Paul Wisner, president of Parliament News, Inc., which distributed and sold American Art materials on a national scale; that Howard Green was also present at the weekly meetings; that American Art was a publishing company; that the materials were printed by London Press, bound by Oxford Bindery, and distributed locally by Pacific News and nationally by Parliament News; that Milton Luros was also the major stockholder in London Press, Oxford Bindery and Parliament News; that he thought he was told the same person, Rita Grossman, was the corporate "Secretary of Parliament and Pacific, and the printing and binding companies, London and Oxford;" and that during discussions with Milton Luros, he (Luros) explained that he wanted to move the American Art operations to the Lassen Street premises in order to bring the publishing together in one place, to have more room and to consolidate the operations under one roof.

Witness Iris Bancroft testified that she was an employee-editor of American Art or one of its subdivisions and worked on such publications as *Casebook, Foreplay, The Elusive Orgasm, When Too Much Sex Isn't Enough,* and *The Mate-Exchange Game*; that she requested photographs of sexual activity from Fred Fixler in connection with her work; that the photographs came from Fred Fixler or from American Art files for her final approval; that she participated in a profit-sharing program while at the Lassen Street premises; that in 1965 or 1966 Jaybird occupied some of the rooms in the same building as American Art; that Robert Reitman hired her at Jaybird and Milton Luros was in control of some of the corporations; that she left and rejoined American Art at the

That the commercial structure on the Lassen Street premises, approximately 120,000 square feet in size, consists of warehouse facilities of approximately 100,000 square feet, used for shipping, receiving, storing and shredding books and magazines, and office space of approximately 20,000 square feet, used for the publication and distribution of books and magazines, including editorial, administrative, bookkeeping, clerical, payroll, art and layout offices, and a photo department, including a photo library and photo developing and processing laboratories, in which at least 100 persons were regularly employed on the premises during the period January through August 1972.

That from January through August 1972, American Art Enterprises employed staff photographers, four of whom regularly photographed male and female models while engaged in various sexual activities;[4] that

Lassen Street premises in December 1971 or January 1972; and that Academy Press and Socio Library were subsidiary companies under Seven Towers which used photographs of sexually explicit activities.

[4]*Internal Operations of American Art in Respect to Photographers*: The internal operations of the photographic department of American Art located at Lassen Street was testified to by three photographers employed by the company, namely Robert Melford Vose, Benson Phillips and Robert C. Kanters, and by the photo librarian, Geraldine Price. Their testimony was substantially as follows:

Witness Robert Melford Vose testified that he worked for about three months as a photographer for American Art out of their "main base of operation" on Lassen Street; that he was hired by Fred Fixler, who was the photographic editor; that while he was with American Art the shootings "were all nude, but they were from soft core to hard core;" that he attended meetings in Fred Fixler's office which were attended by other photographers, namely "Nippy" Phillips, Green, Kanters, Utterback, and Kirk; that the meetings were mainly called for the express purpose of keeping the eroticism of the photographs up to a standard at which they were required to be by Fred Fixler who "would hold the photograph and point out the photographer, and point out the inadequacy of the eroticism in this picture so all could see, so they would not do the same."

Witness Benson Phillips testified that he was a photographer for American Art and worked with Kanters, Utterback and Kirk; that he was paid a salary by checks issued by either American Art Agency or American Art Enterprises; that his immediate supervisor was Fred Fixler; that his film was furnished by Fred Fixler; that the "models" were usually obtained from model agencies; that there were normally three people ("models") in each shooting, usually two females and one male or sometimes two males and one female, in which they would go through a series of different situations; that the activity in each shooting ranged from soft core or simulated sex to include hard core and explicit sex; that scripts and film for the shootings were supplied by Fred Fixler, handed out at the Lassen Street premises; that the exposed film was returned to the Lassen Street premises for processing; that Fred Fixler often contacted the photographer at his shooting location by telephone from the Lassen Street premises; that he normally paid $25 for a shooting location at "locales from the West end of the Valley all the way down into Hollywood;" that the photographers were supplying photographs for eight to ten hard core-type magazines and that the names of the "models" were kept on file cards

models also were photographed in the nude and in poses simulating sexual activity; that the photographers obtained the models from model agencies not owned or operated by the defendants, which model agencies were located in Hollywood, California;[5] that all photographs

numbering in the thousands; and that American Art always paid the "models" for their sexual activity and required signed release forms which were also supplied by American Art and which were returned to Fred Fixler at the Lassen Street premises.

Witness Robert C. Kanters, employed as an American Art photographer, testified substantially as follows: that he was hired as a photographer by Fred Fixler, photo editor, on January 8, 1968, and Milton Luros, owner of the company, played a role in hiring him; that when the company was located at the Fulton Avenue address before the move to the Lassen Street premises there was a meeting with the company's counsel discussing the legal ramifications of photographing people in sexual activity; that the photographers were given the telephone numbers of legal counsel and a special night line number along with the telephone number of the company's bail bondsman; that he (Kanters) started shooting explicit sexual material in middle 1970 and continued in that activity on a regular basis until he left the company on August 10, 1972; that Fred Fixler was his immediate supervisor while he was with the company; that the photographers were shooting explicit sexual activity approximately three days a week (Monday, Wednesday and Friday); that the other two days a week (Tuesday and Thursday) they would report to the Lassen Street premises where they would "turn in the film" to Fred Fixler's secretary, along with expense vouchers for the moneys paid the "models" and the releases signed by the "models;" that the company also paid the photographers for their mileage to and from the shooting locations and supplied some of the photographic equipment; and that their film was processed at the Lassen Street premises.

Witness Kanters further testified that the photo requests were received from the editors or through Fred Fixler and that in 1972 approximately 85 to 90 percent of the shootings were explicit hard core; that normally three "models" were used for each shooting session which lasted for about five hours, three days a week; that they did not shoot when the "heat" was on and they were apparently being followed by the police; that an effort was made to get as many different "models" as possible as directed by American Art; that the "models" were paid from $25 to $100 in cash and signed a release form supplied by American Art after each shooting; and that while the shootings were in progress he often had telephone communication with Fred Fixler at American Art.

Witness Kanters also testified that in the fall of 1971 as part of his work for American Art he photographed a 14-year-old "model" Patricia F. in explicit sexual poses which culminated in criminal proceedings in the case of *People* v. *Fixler, supra,* 56 Cal.App.3d 321; that after he had surrendered himself in the *Fixler* case on a felony pandering charge he continued to shoot sexually explicit hard core activities for American Art to meet the requirements for approximately 22 American Art magazines per month.

Witness Kanters further testified that the "models" were obtained through model agencies such as Photo West owned by Irving Sofsky, Sunset International owned by a person known as "Reb," Pretty Girl International owned by Russ McNiff, and C. H. N. owned by Hal Guth. In 1972 he personally used Photo West. He paid the agent $15 to $25 per "model."

Witness Geraldine Price, photo librarian for American Art, testified that "[she] would stamp, say, a thousand photographs a day, and then other days, [she] would only stamp maybe 25 or 30" but that on an average thousands of new photographs came in each week in which the hard core portion showed the full range of explicit sexual activity.

[5]*The Model Agencies*: Witness Irving Sofsky testified that he was the owner and operator of a model agency known as Photo West; that he had booked "the 14-year-old

were taken and used exclusively for the purpose of illustrating the books and magazines published by defendants at the premises and distributed by defendants from the premises; that the photographers did not engage in sexual activity with the models but they did direct and pay for said activity at the behest of defendants in order to photograph the activity; that the models were photographed in private residences, apartments and commercial studios throughout Los Angeles County and on occasion were photographed outside of Los Angeles County as far away as San Francisco; that no models were photographed on the Lassen Street premises; that the Lassen Street premises, from the date of their occupation in January 1972 through August 1972 were used as the base of operations for said photographers, and their activities were coordinated there, i.e., bi-weekly meetings were held on the premises in the office of Fred Fixler, their supervisor, at which meetings prior photographic shootings were discussed, directions and photographic requirements were given, raw film was dispensed, the photographers' personnel records were maintained, their vouchered expenses (food, travel, model, agent and location fees) were submitted and paid, they, on occasion, used the phone to arrange shootings, they returned their exposed film for processing and examined the prints thereof; that files on models and model agencies were maintained on the premises, as well as files of negatives, transparencies and prints; that Fixler maintained phone contact with the photographers when they were in the field; that all the books and magazines, including those containing the product of the aforesaid explicit or hard core shootings were printed off the premises and returned there for storage and distribution; that wigs for the models

model Patricia F. to American Art photographers Kanters and Utterback in 1971 for hard core activity;" that he also continued to book models for hard core shootings into 1972; that some of the "models" had venereal disease and he took them "to the free clinic;" that following the criminal proceeding against him as a defendant in the *Fixler* case involving Patricia F. he decided to cooperate with law enforcement officers and closed his business at the end of July 1972; that during July 1972 photographer Kanters paid him a fee for some of his models that he (Kanters) had booked for hard core activity without his (Sofsky's) knowledge; and that while the Patricia F. case was in criminal proceedings Fred Fixler encouraged him to continue supplying "models" to American Art photographers.

Witness Craig E. Sawitz testified that he was the owner and operator of a model agency known as "Reb's Sunset International;" that he booked several hundred models out of his agency from January to August 1972 and booked models for American Art photographers Phillips, Kirk and Utterback in 1972 for purposes of shooting explicit sexual activity; that American Art "took up most of the business;" that photographers Utterback and Phillips each took 3 models for 3 times a week for a total of 18 per week for 85 to 90 percent hard core shootings in January and continued through May and June of 1972; that he received $20 to $25 per model per shooting; and that he had sent models to the clinic for venereal diseases.

and photographic equipment were stored at the premises; that from January through August 1972, one of the four photographers employed sixty-six different persons in Los Angeles and San Francisco Counties in explicit or hard core sexual activities; that modeling sessions typically involved two females and a male as models and took place three times a week; that modeling often involved persons meeting for the first time; that some models had a preexisting sexual relationship; that venereal disease was reportedly present on occasion among the models; that defendants typically paid a male $35 and a female $50 per modeling session, whether actual or simulated sexual activity was involved and agents were paid approximately $20 per model per session; that at least several hundred persons were employed by defendants off the premises in the period January through August 1972 as models; that at the direction of said staff photographers, they engaged in acts of explicit sexual activity,[6] including heterosexual intercourse, oral copulation, and sodomy, group sex, ejaculation, masturbation, and homosexual and lesbian activity; that said models also engaged in simulated sexual activity; that the acts in which the models engaged at the behest of defendants and their agents during explicit or hard core shootings were acts of prostitution and the activity in which they then engaged was prostitution.

---

[6] *The "Models"*: Witness Deborah Jackson testified that she got into the modeling business from an ad in the Free Press; that she posed for photographer Kanters on four or five occasions and under his direction engaged in sexual intercourse with a male and orally copulated a female.

Witness Patricia Trammell, age 20, testified that she was in the "modeling" business for five years; that she had posed for Lee Utterback, Ken Kirk, "Nippy" Phillips and Bob Kanters; that she shot hard core consisting of sexual intercourse and oral copulation for photographer Kanters three, four or five times; that she was paid $50 a session and signed releases having the name of Amercian Art Enterprises on them; that she did not use her true name "because [she] didn't want to get arrested;" that on occasions Kanters cancelled shootings because he thought he was being followed by the police; that she "contracted venereal disease three times, twice, [she's] sure, from modeling."

Witness Susan Patterson testified that in 1971 and 1972 she was engaged in sexual photography modeling; that in April 1972 she was paid by Kanters at the rate of $10 an hour to engage in sexual intercourse and oral copulation under his (Kanters') direction.

Witness Kirby Adams testified that he was paid $35 by Kanters to be photographed engaging in explicit sexual conduct and he was directed by Kanters into the different positions.

Witness Jeffrey Patterson testified he was paid by Kanters to engage in sexual relations during two shooting sessions and described the arrangement in the following street vernacular in a signed statement for a police officer: "We knew we would be shooting hard core, because I always asked, prior to the shooting, because I could get more money for hard core. Kanters would mention a certain amount of money, and said that we would be doing fucking and sucking."

That persons employed on the premises engaged in business activities concerned with the publication and distribution of books and magazines, which activities included the solicitation, direction, payment, overseeing, and record-keeping of hundreds of acts of prostitution which said acts were photographed; that said photos were distributed from the premises in the aforesaid books and magazines; that at all times, the facilities contained within the premises and the movable property upon the premises were used for the primary purpose of publishing and distributing books and magazines; that the facilities and corporate entities on the premises were physically and functionally integrated; that from January through August 1972 approximately one-third of the books and magazines published and distributed by defendants at the premises contained photographs depicting explicit sexual behavior; approximately one-third contained photographs depicting nudity and/or nonexplicit sexual activity; approximately one-third were paperback books containing no photographs; that a total of approximately 3 million copies of said books and magazines of all types were stored on the premises for distribution during 1972; that they were distributed from the premises countywide, statewide, nationwide, and worldwide.

Having made the above findings of fact, the trial court made the following pertinent conclusions of law:

*Trial Court Conclusions of Law*

1. That the acts in which the models engaged at the behest of the defendants and their agents during the explicit or hard core shootings were acts of prostitution and the activity in which they then engaged was prostitution;

2. That at no time were the premises "used for the purpose of prostitution" within the meaning of Penal Code section 11225; and

3. That a building used for the publication and distribution of books and magazines is not subject to the provisions of the Red Light Abatement Law.

ISSUES

The determinative issues on appeal are: (1) whether or not the hiring of "models" to engage in explicit sexual activity for the purposes of

photographing such activity constitutes prostitution within the meaning of section 11225; (2) whether or not the Lassen Street premises were "used for the purpose of prostitution" within the meaning of section 11225; and (3) whether or not the use of the Lassen Street premises for the publication and distribution of printed materials invokes First Amendment protections which affords the premises immunity from the remedial provisions of section 11225 et seq.

## DISCUSSION

I take judicial notice of the record on appeal in the case of *People v. Fixler, supra,* 56 Cal.App.3d 321 (petn. for hg. den. May 14, 1976) to the extent that it impinges upon and throws light on the issues in the case at bench. In the instant case American Art was the employer of Fred Fixler and Harry Lee Utterback, II, who were defendants in the *Fixler* case. All of the witnesses who testified in the *Fixler* case also testified during the trial of the case at bench and many exhibits introduced into evidence in that case were also introduced into evidence by reference in the instant case.

The trial in the *Fixler* case took place prior to the trial of the case at bench but the decision in *Fixler* did not become final until 1976, after the trial of the case at bench which occurred in 1975.

*The Fixler Case*

In the *Fixler* case, Fred Fixler, Robert Kanters and Harry Lee Utterback II, following a grand jury indictment, were prosecuted for conspiracy to violate Penal Code section 266i, a felony (pandering).

Defendant Fixler was a "photo editor" for American Art while defendant Utterback and Kanters were photographers employed by American Art, a hard core pornographic publishing firm, defendants/respondents in the case at bench. Defendant Kanters turned state's evidence, the charges originally filed against him were dismissed, and he testified for the prosecution.

Fixler in his capacity as "photo editor" for American Art directed the work of the photographers, held meetings at which the quality and content of the pictures were discussed, and gave instructions to the photographers as to what they should do in case of arrest.

The photographers procured the services of their subjects from independent modeling agencies, one of which was Photo West Model Agency owned by Irving Sofsky,[7] and paid various fees to these "models" for engaging in lewd acts and explibit sexual activity ranging from masturbation to homosexual or heterosexual oral copulation and sexual intercourse.

One of these "models," Patricia F. was a 14-year-old girl who was hired on some 8 to 15 occasions to engage in the above described sexual activity for Utterback and Kanters in return for money which was provided by American Art, defendant/respondent in the case at bench. At each photographic session, the photographer told Patricia F. how to pose and what to do.

Following a nonjury trial Fixler and Utterback were convicted of conspiring to violate, and of violating, the anti-pandering statute (Pen. Code, § 266i).

The Court of Appeal affirmed. In rejecting Fixler's and Utterback's contention that because their intent was to publish some of the photographs in a magazine their conduct in hiring the girl was somehow clothed by the protection of the First Amendment constitutional guarantee of freedom of speech, the court pointed out that not all conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea. The court held that even accepting defendants' claim that they intended to use the photographs in a nonobscene publication, defendants in obtaining the photographs became by definition common panderers, regardless of the facts that they were nonparticipants in the sexual activity and that their primary motivation was to photograph it.

I

*Does the hiring of "models" to engage in explicit sexual activity for the purposes of photographing such activity constitute prostitution within the meaning of section 11225?* YES.

[7]Charges against Irving Sofsky were dismissed at the preliminary hearing and he cooperated with law enforcement officials. Sofsky who had been arrested five times for pandering in connection with related activities had ceased booking "models" for "hard core" pornography. In June 1972 Fixler saw Sofsky to ask him why he (Sofsky) was no longer booking models for him and reminded Sofsky that he (Fixler) had a weekly budget of some $1,600 to spend for agency fees.

I concur with the trial court and the majority opinion that the evidence in the instant case and case law support the finding of fact and conclusion of law "that the acts in which the models engaged at the behest of the defendants and their agents during explicit or hard core shootings were acts of prostitution and the activity in which they then engaged was prostitution."

The People's witness Sergeant Glenn R. Souza of the Los Angeles Police Department testified that he was an investigator in the administrative vice division and was involved with between 1,500 to 2,000 cases of prostitution investigations and arrests while enforcing the laws against prostitution; that in his opinion when sex models are engaged in explicit sexual activities they are engaging in prostitution; that a shorthand working definition of prostitution is "sex for money;" that during the year of late 1969 to late 1970 prostitution mushroomed in Los Angeles County; and that much of it was being conducted through "legitimate fronts" such as "massage parlors, sexual therapy clinics, communication centers, nude modeling studios, [and] body painting studios." He further testified that in his opinion it is not necessary that the sexual acts are paid for by one of the persons engaging in the conduct and that "models being paid for their [sexually explicit] activities" constitute prostitution.[8]

---

[8]Witness Souza testified on direct examination as follows:

"Q. BY MR. ELDEN: Are you acquainted with the—from your work in law enforcement, are you acquainted with the so-called sex modeling business, here in Los Angeles County?

"A. Yes, I am.

"Q. And in your own words, when you refer to the sex modeling business, how would you describe that, Sergeant?

"A. Sex models being those persons who pose for explicit sexual acts for publication.

"Q. Would it also include those models who pose for simulated activities?

"A. Yes.

"Q. Now, when you use the term sex modeling business, are these—are you referring to a business in which the models are paid for the activity that they engage in?

". . . . . . . . . . . . . .

"THE WITNESS: I would consider them to be paid in that context. Models being paid for their activities, yes, sir.

"Q. BY MR. ELDEN: Do you have an opinion as to whether or not sex modeling, as you have described it, is prostitution?

"A. Yes, I do.

"Q. What is your opinion?

"A. In my opinion, that is prostitution.

". . . . . . . . . . . . . .

"Q. BY MR. ELDEN: Are there differences, Sergeant Souza, in the ways that the police department attempts to deal with prostitution, in the sex modeling business, as opposed to, say, the street-walking, call-girl, whorehouse-type of prostitution?

"A. Yes. And the main difference is between the soliciting or the engaging in

In *People* v. *Fixler, supra,* 56 Cal.App.3d 321, defendant Fred Fixler was, as previously noted, a "photo editor" for defendant American Art in the instant case. The *Fixler* case is dispositive of this issue in which the court said at pages 324 and 325: "There is little dispute as to the facts underlying the judgment. Utterback was one of several photographers employed by American Art Enterprises, a concern that publishes various magazines devoted to the depiction of sexual activity. Fixler was a 'photo editor' for American Art Enterprises. In that capacity he directed the work of the photographers and from time to time held meetings at which the quality and content of the pictures was discussed. At one meeting Fixler gave instructions to the photographers as to what they should do in the case of arrest.

"The photographers obtained the services of their subjects from independent modeling agencies and paid various fees to these 'models' for engaging in several types of sexual activity while being photographed. This activity ran the gamut from masturbation through homosexual oral copulation to heterosexual oral copulation and sexual intercourse.

---

prostitution.

"Q. Could you explain that answer?

"A. Well, the traditional effort is against the soliciting violation. Soliciting for an act of prostitution. It's very difficult for an officer to be a party to an engaging violation. Engaging in prostitution, equally, is illegal; is a much different type of investigation.

"THE COURT: I'm not sure that I quite understand. Are you telling us, sir—if I do understand, that is fine. If I don't, let's find out what it is—are you telling us, in the traditional street-walker-type, the emphasis is upon solicitation?

"THE WITNESS: Yes. That is the principal enforcement.

"THE COURT: Yes, I understand. Whereas in the investigation of the sex modeling business, it is not?

"THE WITNESS: Yes, sir. It is impossible for a stranger; or almost impossible for a stranger, an outsider to be a party to the solicitation, therefore you must investigate the engaging, because it usually gets to the stage of engaging before the police become aware of it.

". . . . . . . . . . . . . . .

"Q. BY MR. ELDEN: Can you tell us whether or not the sex modeling industry would fall into what you are terming as a so-called legitimate front?

"I don't believe there is an objection pending.

"MR. BROWN [defense counsel]: No.

"THE WITNESS: In my opinion, it is a legitimate front for prostitution.

"Q. BY MR. ELDEN: That is what you mean by the term?

"A. Yes, it is one of the several legitimate fronts.

"Q. What are some of the other fronts, just very briefly?

"A. Massage parlors, sexual therapy clinics, communication centers, nude modeling studios, body painting studios."

"The instant prosecution was based essentially on the use of one Patricia, a 14-year-old girl who was hired on some 8 to 15 occasions to perform for Utterback and one Robert Kanters, in return for money which was provided by American Art Enterprises.

"Penal Code section 266i condemns among other things the procuring of another person for the purpose of prostitution or the causing, inducing, persuading or encouraging another to become a prostitute.

"Prostitution is defined as 'Common lewdness of a woman for gain' (Black's Law Dict. (4th ed.)) 'act or practice of engaging in sexual intercourse for money.' (Random House Dict. of the English Language (Unabridged ed.)) or '. . . any lewd act between persons for money or other consideration.' (Pen. Code, § 647, subd. (b).)

"There can be no question but that Patricia engaged in lewd acts and sexual intercourse for money and that defendants, by providing the money and directing her performances, procured, caused and induced her to do so. (See *People* v. *Bradshaw,* 31 Cal.App.3d 421 [107 Cal.Rptr. 256]; *People* v. *Montgomery,* 47 Cal.App.2d 1 [117 P.2d 437]; *People* v. *Courtney,* 176 Cal.App.2d 731 [1 Cal.Rptr. 789].) There is nothing in statute or case law which would remove this conduct from the ambit of the statute (Pen. Code, § 266i), simply because the money was provided by nonparticipants in the sexual activity or because the defendants' primary motivation was to photograph the activity.

"It seems self-evident that if A pays B to engage in sexual intercourse with C, then B is engaging in prostitution and that situation is not changed by the fact that A may stand by to observe the act or photograph it. A criminal act is not made any the less criminal by pictorial recordation of the act. (See *People* v. *Zeihm,* 40 Cal.App.3d 1085 [115 Cal.Rptr. 528].)" (Fn. omitted.)

II

*Were the Lassen Street premises "used for the purpose of prostitution" within the meaning of section 11225?* YES.

Penal Code section 11225 of the Red Light Abatement Law provides in part: "Every building or place *used for the purpose of* . . . lewdness, assignation, or *prostitution,* and every building or place in or upon which

acts of . . . lewdness, assignation, or prostitution, are held or occur, is a nuisance which shall be enjoined, abated and prevented, whether it is a public or private nuisance." (Italics added.)[9]

I concur with that portion of the majority opinion which holds that "premises where acts of prostitution are arranged to be consummated elsewhere are subject to abatement under the act." In addition to the cases of *People v. Barbiere* (1917) 33 Cal.App. 770 [166 P. 812],[10] and *People v. McGonigle* (1942) 56 Cal.App.2d 17 [132 P.2d 7] (petn. for hg. den. Feb. 4, 1943),[11] cited in the majority opinion, rules of statutory construction also support that conclusion.

---

[9]It is clear that American Art is a "person" and the Lassen Street premises are a "building" within the purview of sections 11234 and 11235 of the Red Light Abatement Law which provide as follows:

" 'Person' as used in this article means individuals, corporations, associations, partnerships, trustees, lessees, agents and assignees." (§ 11234, added by Stats. 1953, ch. 35, § 1, p. 649.)

" 'Building' as used in this article means so much of any building or structure of any kind as is or may be entered through the same outside entrance." (§ 11235, added by Stats. 1953, ch. 35, § 1, p. 649.)

[10]In *Barbiere,* the court upheld the abatement of both a *saloon* and a *house of prostitution.* Although these two buildings were separate and occupied separate pieces of real property, they were connected by a common passageway. There were "[n]umerous circumstances tending to establish the proposition that the saloon business of Barbiere and the assignation apartments of Maddalena were used to facilitate the business of each . . . ." (*People v. Barbiere, supra,* 33 Cal.App. 770, 781.) The *Barbiere* court held the saloon itself was covered under the first provision of the Red Light Abatement Law, stating at page 781: "[I]t is fairly inferable that the entrance into the Maddalena apartments through the saloon was maintained not alone for the purpose of providing for the visitors and inmates easy and unobserved access to the Maddalena apartments, which the evidence plainly enough shows were conducted as a place of prostitution, but also for the purpose of readily furnishing the inmates of and frequenters to the apartments with liquors and wines . . . ."

[11]In *McGonigle,* the court held that a structure which served as a "nerve center" for a prostitution operation (albeit on a much smaller scale than the case at bench) was subject to the Red Light Abatement Law even though the actual acts of prostitution were not conducted at the "nerve center." In *McGonigle,* defendant Rose McGonigle appealed from a judgment entered against her under the provisions of the Red Light Abatement Act (Stats. 1913, p. 20; Deering's Gen. Laws (1937) Act 6161). The trial court had ordered that a hotel building known as the Stockyards Hotel be closed for a period of one year and the furniture and fixtures located therein be sold as provided by law.

Defendant McGonigle employed a number of girls to carry on prostitution in the hotel. After police officers made a number of arrests, defendant converted a storeroom into several bedrooms which was referred to as the "annex." A separate entrance was provided for the "annex," given a separate street number and no means was provided for passage between the "annex" and the rest of the premises. Defendant operated the entire premises from a room in the hotel where she collected the money from the prostitutes and frequently communicated with them in the "annex" by knocking on a thin partition.

The appellate court in affirming the judgment stated: "We are satisfied that the

Penal Code section 4 provides as follows: "The rule of the common law, that penal statutes are to be strictly construed, has no application to this Code. All its provisions are to be construed according to the fair import of their terms, with a view to effect its objects and to promote justice."

The object of the Legislature by enacting section 11225 was to attack the problem of "the treatment of a sociological problem whose solution has puzzled the best thought of mankind from the beginning of organized society, if not from the beginning of the world," (*People* v. *Barbiere, supra,* 33 Cal.App. 770, 775) i.e., generally "the exploitation of sexual desires for profit" (*People* ex rel. *Hicks* v. *Sarong Gals* (1972) 27 Cal.App.3d 46, 49 [117 Cal.Rptr. 24]) and specifically the repression of "lewdness, assignation, and prostitution." (§ 11225.)

In ascertaining the intent of the Legislature so as to effectuate the purpose of section 11225 it "should be interpreted so as to produce a result that is reasonable. (*Ivens* v. *Simon* (1963) 212 Cal.App.2d 177, 181 [27 Cal.Rptr. 801].) If two constructions are possible, that which leads to the more reasonable result should be adopted. (*In re Kernan* (1966) 242 Cal.App.2d 488, 491 [51 Cal.Rptr. 515].)" (*Alford* v. *Pierno* (1972) 27 Cal.App.3d 682, 688 [104 Cal.Rptr. 110].)

Here, the Lassen Street premises were the "nerve center" which orchestrated a vast prostitution operation and from which the solicitation, direction, payment, overseeing, and record keeping of hundreds of acts of prostitution were conducted. American Art photographers, under the supervision of Fred Fixler, the "photo editor," proceeded from the Lassen Street premises three days a week to various locations where photographs were taken with film supplied by American Art. The photographers hired three or four "models," male and female, paid for by American Art, at each session to engage in explicit sexual activities under the direction of the American Art photographers. Fred Fixler during the shooting sessions was often in direct contact with the photographers by telephone from the Lassen Street premises. The evidence in the case of *People* v. *Fixler, supra,* 56 Cal.App.3d 321, shows that one "model," Patricia F., was a 14-year-old girl. There was evidence

---

evidence is sufficient to support the trial court's finding that the entire premises, the old part of the structure as well as the annex, were used for the purpose of prostitution." (*People* v. *McGonigle, supra,* 56 Cal.App.2d 17, 20.)

that some of the "models" contacted venereal disease during the sexual activities.

It would be unreasonable to conclude that the Legislature intended that only the tentacles of the prostitution octopus would be subject to abatement pursuant to section 11225 and excluded its operational effect from striking at the head ("nerve center") of the octopus.

Moreover, in construing a statute consideration must be given to other statutes *in pari materia* (*People* v. *Navarro* (1972) 7 Cal.3d 248, 273 [102 Cal.Rptr. 137, 497 P.2d 481]) and " '. . . to the whole system of law of which it is a part so that all may be harmonized and have effect.' . . ." (*Select Base Materials* v. *Board of Equal.* (1959) 51 Cal.2d 640, 645 [335 P.2d 672]; *People* v. *Taylor* (1975) 46 Cal.App.3d 513, 531 [120 Cal.Rptr. 762].)

Illustrative of statutes *in pari materia* in respect to the principle that acts of prostitution need not occur on the premises sought to be abated are those under the pandering statutes.

The case of *People* v. *Martin* (1964) 228 Cal.App.2d 677 [39 Cal.Rptr. 669], involved a prosecution under Penal Code section 266i (pandering). The conviction was upheld where the madam, operating from her own residence (where "trick" books were subsequently found), had sent men over to the prostitute's own apartment. The applicable statute encompassed any place where prostitution was encouraged or allowed. The court at pages 680 and 681 said: "[I]t may be true that the phraseology of the section is more consonant with the old-fashioned houses of ill fame of the 'crib house' variety [citation], the legislative intent is clearly to provide proscriptions against, and punishments for, those who would batten upon the weaknesses of others. Since the activities of the modern 'madam' still fall within both the letter of the statute and its obvious intent, she is answerable thereto.

"The fact that in this day of telephonic communications and rapid automotive travel the madam's 'parlour' may be her own apartment equipped with telephone and 'trick books,' and the 'cribs' of the mentally, morally or spiritually bankrupt girls from whose degradation she seeks to profit may be their private apartments spread throughout the city, renders her actions no less despicable or identifiable as pandering."

In *People* v. *Schultz* (1965) 238 Cal.App.2d 804 [48 Cal.Rptr. 328] (a pre-1969 pandering case under § 266i), the police had a call girl under surveillance in a hotel. After her liaison with a customer, she phoned an apartment in another part of town and said, " ' "[I] am all finished and ... I am coming right back." ' " (*Id.,* at p. 809.) The reviewing court held that not only was the hotel room a "house of prostitution and a place where prostitution was allowed" (*id.,* at p. 813) but also that "defendant's apartment was a place where prostitution was encouraged ...." (*Id.,* at p. 813.)

In construing the applicability of section 11225 one "[m]ust look to the context of the law, and where uncertainty exists, consideration should be given to the consequences that will flow from a particular interpretation, (*Ivens* v. *Simon, supra,* 212 Cal.App.2d 177, 181)" and "take into account matters such as context, the object in view, the evils to be remedied, the history of the times and of legislation upon the same subject, public policy, and contemporaneous construction. (*Estate of Jacobs* (1943) 61 Cal.App.2d 152, 155 [142 P.2d 454].)" (*Alford* v. *Pierno, supra,* 27 Cal.App.3d 682, 688; see also *People* v. *Navarro, supra,* 7 Cal.3d 248, 273.)

In the instant case section 11225 reflects the public policy of repressing the evil of prostitution by declaring it to be a nuisance subject to abatement and is in harmony with other statutes *in pari materia* directed at the repression of prostitution.

The history of the times was described by Sergeant Souza who testified that during the year of late 1969 to late 1970 prostitution mushroomed in Los Angeles County and that much of it was being conducted through "legitimate fronts" such as "massage parlors, sexual therapy clinics, communication centers, nude modeling studios, [and] body painting studios."

The court in *People* v. *Osuna* (1967) 251 Cal.App.2d 528 [59 Cal.Rptr. 599] (violating a pandering statute), said at page 532: " 'The fact that in this day of telephonic communications and rapid automotive travel the madam's "parlor" may be her own apartment equipped with telephone and "trick books," and the "cribs" of the mentally, morally or spiritually bankrupt girls from whose degradation she seeks to profit may be their private apartments spread throughout the city, renders her actions no less despicable or identifiable as pandering.'

*"In short, the evil which is the target of the statute is not immunized from attack by modern plumage and fine feathers of a protective coloration."* (Italics added.)

## III

*Is the Lassen Street premises afforded either blanket or partial immunity from the remedial provisions of section 11225 by reason of First Amendment rights?* No.

This is not an obscenity case. Therefore, *People* ex rel. *Busch* v. *Projection Room Theater* (1976) 17 Cal.3d 42 [130 Cal.Rptr. 328, 550 P.2d 600], cert. den., 429 U.S. 922 [50 L.Ed.2d 289, 97 S.Ct. 320], and *Perrine* v. *Municipal Court* (1971) 5 Cal.3d 656 [97 Cal.Rptr. 320, 488 P.2d 648], cert. den., 404 U.S. 1038 [30 L.Ed.2d 729, 92 S.Ct. 710], are inapplicable as indicated in the majority opinion.

This is a prostitution case in which the imposition of the remedial provisions of section 11225 et seq. would in no way result in governmental action which would close down printing presses or confiscate and destroy printed materials.

The People through documents filed in the trial court on April 22, 1975, stated: "No printing presses were even at Lassen Street and none will be stilled now. Plaintiffs encourage the Court to except books and magazines from any order selling moveable property. The defendants, with the demise of Academy Press in 1974 and the passage of time, are unlikely to have on the premises the three million publications that were in aid of their corrupt business in August 1972. Accordingly, whatever publications defendants now store at Lassen should be permitted to be removed for the legal use of defendants from other premises." Moreover, evidence presented at the trial coupled with remarks of counsel during oral argument on appeal indicate that American Art has again dispersed its publication activities from the Lassen Street premises while retaining an ownership interest in the property.

I would hold as a matter of law that there are no "incidental restriction[s] on alleged First Amendment freedoms" within the meaning of *United States* v. *O'Brien* (1968) 391 U.S. 367, 377 [20 L.Ed.2d 672, 680, 88 S.Ct. 1673], or *Crownover* v. *Musick* (1973) 9 Cal.3d 405, 422-423 [107 Cal.Rptr. 681, 509 P.2d 497], by reason of (1) the present posture of the

case, (2) the magnitude of the prostitution operation, (3) the importance the Legislature attaches to the abatement of such a nuisance, i.e., prostitution,[12] and (4) the case of *People* v. *Fixler, supra,* 56 Cal.App.3d 321.

Paraphrasing the opinion in the case of *People* v. *Fixler, supra,* 56 Cal.App.3d 321, at pages 325-327, I would hold that "The [Red Light Abatement action] here was based on [the use of the Lassen Street premises as a 'nerve center' for prostitution] and was not aimed at prohibiting any communication of ideas. . . . [T]he ultimate use to which those photographs [of the acts of prostitution] might be put are separate and unrelated issues. While First Amendment considerations may protect the dissemination of printed or photographic material regardless of the manner in which the material was originally obtained, where a crime is committed in obtaining the material, the protection afforded its dissemination would not be a shield against prosecution for the crime committed in obtaining it.

"The fact that a motion picture of an actual murder, rape or robbery in progress may be exhibited as a news film or a full length movie without violating the law does not mean that one could with impunity hire another to commit such a crime simply because the primary motivation was to capture the crime on film.

"As the United States Supreme Court stated in *United States* v. *O'Brien,* 391 U.S. 367, at page 376 [20 L.Ed.2d 672, at page 679, 88 S.Ct.

[12]The importance the Legislature attaches to the abatement of such nuisances as described in section 11225 is reflected in sections 11226-11229.

Section 11226 provides: "Whenever there is reason to believe that a nuisance as defined in this article is kept, maintained or is in existence in any county, the district attorney, in the name of the people of the State of California, *must,* or any citizen of the State resident within said county, in his own name may, maintain an action in equity to abate and prevent the nuisance and to perpetually enjoin the person conducting or maintaining it, and the owner, lessee or agent of the building, or place, in or upon which the nuisance exists, from *directly or indirectly* maintaining or permitting it. . . ." (Italics added.)

Section 11227 provides that a temporary writ of injunction *shall* issue when the existence of a nuisance is shown to the satisfaction of the court.

Section 11228 provides that such actions "have precedence over all actions, excepting criminal proceedings, election contests and hearings on injunctions . . . ."

Section 11229 provides: "Any violation or disobedience of an injunction or order expressly provided for by this article is punishable as a contempt of court by a fine of not less than two hundred dollars ($200) nor more than one thousand dollars ($1,000), by imprisonment in the county jail for not less than one nor more than six months, or by both."

1673]: 'We cannot accept the view that an apparently limitless variety of conduct can be labeled "speech" whenever the person engaging in the conduct intends thereby to express an idea.' (Also see *Silva* v. *Municipal Court,* 40 Cal.App.3d 733 [115 Cal.Rptr. 479].)

"No creative communication is involved in the hiring of [hundreds of male and female 'models'] to engage in depraved and perverted sex acts. The character of that activity is not altered by the pretense of photographing it. (Compare *State* v. *Ray,* 292 Minn. 104 [193 N.W.2d 315, 48 A.L.R.3d 1306].)

"
. . . . . . . . . . . . . . . . . .

"The California Supreme Court held in *Barrows* v. *Municipal Court,* 1 Cal.3d 821 [83 Cal.Rptr. 819, 464 P.2d 483], that acts which are independently prohibited by law cannot be consummated without sanction merely because they occur in a theatrical setting and [I] conclude they cannot be consummated without sanction because they occur in the course of preparing material which may ultimately be exhibited in a manner protected by the Constitution. (See *People* v. *Drolet,* 30 Cal.App.3d 207 [105 Cal.Rptr. 824]; *People* ex rel. *Hicks* v. *Sarong Gals,* 27 Cal.App.3d 46 [103 Cal.Rptr. 414].)

"The evidence strongly supports the conclusion that [American Art agents and employees] were well aware of the law prohibiting . . . *prostitution,* that they were aware of the illegality of their conduct and knowingly conspired to [and did] violate those laws. [The nature of the business conducted by] American Art Enterprises [gives it] no special status or immunity." (Italics added.)

### DISPOSITION

I would reverse the judgment and order on all grounds urged on appeal and remand the matter to the trial court to conduct the necessary additional factual inquiries which will result in granting relief, the scope of which, at the wide discretion of the court, will accomplish the purposes of the Red Light Abatement Law (§ 11225 et seq.).

A petition for a rehearing was denied December 20, 1977, and appellant's petition for a hearing by the Supreme Court was denied February 2, 1978. Bird, C. J., and Manuel, J., were of the opinion that the petition should be granted.

APPENDIX A

Flow Chart

| | MILTON LUROS |
| BEATRICE LUROS |
| Major Stockholders |

PARLIAMENT NEWS, INC. — Retail Stores

WORLD NEWS, INC. dba PACIFIC NEWS — Retail Stores

AMERICAN ART ENTERPRISES, INC.

EDITORS

PHOTO DEPARTMENT

PHOTOGRAPHERS

UTTERBACH KANTERS PHILLIPS GREEN KIRK

MODEL AGENCIES

REBS PHOTOWEST P. G. I.

MODELS